# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 03-1286

_____

| | | |
|---|---|---|
| United States of America | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of Nebraska. |
| Joshua Parks, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: October 21, 2003

Filed: April 14, 2004

_____

Before RILEY, BEAM, and SMITH, Circuit Judges.

_____

SMITH, Circuit Judge.

Joshua Parks was convicted by a jury of one count of conspiracy to distribute and possession with the intent to distribute over fifty grams of methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and 846, and three counts of aiding and abetting a false statement in connection with a firearm purchase in violation of 18 U.S.C. § 922(a)(6). Parks disputes whether the jury had sufficient evidence to find a conspiracy involving more than fifty grams, and whether there was sufficient evidence presented to support the gun charges. Parks also challenges the district

court's[1] denial of his motion for downward departure, pursuant to Sentencing Guidelines § 5H1.1, § 5K2.0, and § 4A1.3. Finally, Parks questions the district court's evidentiary ruling permitting the government's use of demonstrative aids during trial. For the reasons set forth below, we affirm the judgment and sentence imposed by the district court.

## I. *Drug Conviction*

Parks first argues that the evidence was insufficient to support his conviction for conspiracy with intent to distribute and possession of methamphetamine with intent to distribute. He contends the evidence does not sufficiently establish that he intended to distribute the methamphetamine. We disagree.

In order to convict Parks of conspiracy to distribute, the government was required to prove that (1) a conspiracy with an illegal purpose existed, (2) Parks knew about the conspiracy, and (3) he knowingly became a part of the conspiracy. *United States v. Washington*, 318 F.3d 845, 852 (8th Cir. 2003). In reviewing whether sufficient evidence was presented to support the charge, we consider the evidence "in the light most favorable to the government, resolving evidentiary conflicts in favor of the government, and accepting all reasonable inferences drawn from the evidence that support the jury's verdict." *United States v. Espino,* 317 F.3d 788, 792 (8th Cir. 2003).

Government witness Laura Tindall testified that she first met Parks in 2000, while employed at a Kwik Shop located in Lincoln, Nebraska. At that time, Tindall was using and selling methamphetamine. Tindall testified that Parks came to the Kwik Shop and told her that he had something for her to try, which she later determined to be a half gram of methamphetamine. She further testified that Parks

---

[1] The Honorable Richard G. Kopf, Chief Judge, United States District Court for the District of Nebraska.

returned to the Kwik Shop a second time, and that they "started kinda doing business together." She told the jury that Parks would provide her with samples of methamphetamine for her own personal use, hoping that she would approve of the drug's quality and sell it to other customers. She testified that Parks provided her with methamphetamine samples fifteen to thirty times, and that each sample was approximately one-half gram of methamphetamine.

Tindall stated that Parks would frequently contact her to inquire whether she needed any methamphetamine for resale, and that in the late fall of 2000 she began to buy methamphetamine directly from Parks. Parks would come to her home, provide her with a sample of methamphetamine to be purchased, and then would give her a price for the methamphetamine. Tindall testified that she purchased "teeners" of methamphetamine (1.75 grams) from Parks on approximately fifteen occasions. In addition to the "teeners" purchased from Parks, she purchased additional amounts of methamphetamine for resale in quantities ranging from one-eighth ounce to one-quarter ounce.

Beginning in the winter of 2000, and continuing through May 2001, Tindall stated that she was purchasing a large enough quantity of methamphetamine from Parks that he "fronted" her a resale supply. Tindall explained these drug fronts as a procedure whereby Parks would provide her with methamphetamine, establish a price, and then she would pay him after she sold the inventory. She stated that Parks fronted her drugs for resale approximately fifteen times.

Tindall also testified that she and Parks would "break down" the drugs. She testified that the "breaking down" process entails separating the drugs–even the small "teener" quantities–into smaller portions for resale. She further testified that on five to six separate occasions Parks brought methamphetamine to her home and they divided the drug into gram to half-gram quantities.

Tindall further testified that in early 2001 Parks brought four bags of methamphetamine–wrapped in cellophane–to her home. She estimated these bags in aggregate contained approximately four ounces of methamphetamine. Parks provided Tindall with a half-gram "sample" and inquired if she could "get rid" of the remaining methamphetamine for him. Tindall testified that because this particular methamphetamine was not of sufficient quality for her customers–she needed injection grade, not smoking grade–she was unable to accommodate his request.

Another government witness, Leonard Woodrum, testified that he purchased methamphetamine from Parks on two occasions. Woodrum purchased a quarter ounce of methamphetamine from Parks in September of 2000. Approximately two weeks later, Woodrum purchased another quarter ounce of methamphetamine from Parks. Also, in October of 2000, Parks fronted one ounce of methamphetamine to Woodrum for resale.[2]

Benjamin Schwab also testified that, for approximately four to five months (sometime after July 2000), he and Parks used and distributed methamphetamine. During this time period, Schwab testified that he and Parks would use methamphetamine approximately every other day. Schwab stated that on one occasion–while traveling in Parks's vehicle–he observed at least one ounce of methamphetamine secreted in a CD case. Also, Schwab testified that he observed Parks "breaking down" an ounce of methamphetamine into "eight balls" (one-eighth ounce quantities). Schwab acknowledged that he knew Parks was in the business of selling methamphetamine and that in October of 2000 he accompanied Parks to York, Nebraska, for the express purpose of acquiring a supply of methamphetamine.

---

[2] Woodrum testified that he was unsuccessful in his attempt to resell this quantity at the price that Parks designated, and the methamphetamine was ultimately returned to Parks.

-4-

Schwab testified that on this trip Parks received two ounces of methamphetamine from Parks's supplier.

Finally, LaTriesha Rogers testified that her roommate, Miranda Easton, contacted Parks to acquire methamphetamine. In response to Easton's request, Parks delivered an "eight ball" of methamphetamine to their residence.

In our review, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319 (1979). Here, numerous witnesses testified that Parks sold and distributed methamphetamine. The testimony also established that Parks provided promotional amounts of the drug to encourage resale; that he often "fronted" drugs for resale; and that he engaged in the "breaking down" process of the drug to facilitate distribution for resale. The witnesses also detailed Parks's involvement in a conspiracy involving a quantity of methamphetamine in excess of fifty grams. Considering the evidence in the light most favorable to the verdict, we find that the evidence was more than sufficient to support Parks's conviction on the challenged count.

## II. *Gun Convictions*

Parks also challenges the sufficiency of the evidence to support the jury's determination that–on three occasions–he aided and abetted a false statement in connection with a firearm purchase. We are not persuaded by his argument.

Tindall testified that in May of 2001, Parks approached her requesting that she purchase a weapon for him using her handgun-purchase certificate. He indicated that he would change ownership into his name at the police department after the purchase. Tindall responded that she did not have the money to buy a handgun. Tindall stated that Parks then agreed to supply the money for the handgun purchase. On May 20,

2001, she and Parks entered Scheels Sporting Goods in Lincoln, Nebraska. Parks selected a weapon and Tindall purchased the handgun and ammunition. At the time of purchase, Tindall attested in writing that she was the actual purchaser of the firearm. She testified at trial that–despite her declaration otherwise–Parks was the actual purchaser of the firearm.[3]

The following day, after Parks explained that he needed another gun, Tindall and Parks went to the Arms & Ammo gun dealer and purchased two handguns with funds supplied by Parks. She testified that after the purchase–and again, contrary to her attestation that she was the actual purchaser–Parks took possession of both newly-acquired firearms.

On May 29, 2001, Tindall again purchased handguns on Parks's behalf. Parks provided the money for the purchase of three additional handguns from the same Arms & Ammo store. Again, Tindall indicated that she was the actual purchaser.

In all, Parks and Tindall purchased six handguns in nine days. At the time of these purchases, Parks was nineteen years of age, had not acquired a permit to purchase a handgun pursuant to Nebraska law, and was ineligible to purchase or possess a handgun. Parks, however, provided the funds for Tindall's purchase of the handguns and took possession of the guns after Tindall completed each purchase. Given Tindall's testimony, the jury's verdict rests on evidence that is more than sufficient to support the gun-related convictions.

---

[3] On appeal, Parks brings particular attention to the fact that at the time of the gun purchases Tindall's–otherwise valid–Nebraska driver's license was expired. While this fact may have assisted the jury in its ultimate determinations relating to Tindall's credibility, it is of little relevance in our review of the sufficiency of the evidence to support the gun charges.

### III. *Downward Departure*

Parks next argues that the district court erred in its refusal to grant his motion for a downward departure. Parks asserts that the Presentence Investigation Report overstated his criminal history and that his case was outside the "heartland" of other defendants. The district court was not persuaded and gave Parks a sentence within the Guidelines range. According to the district court, Parks's criminal history was not overstated, "either in terms of whether it accurately describes the true offense behavior, or the likelihood of the predictive value of recidivism," and that Parks's troubled youth was not "sufficiently extraordinary . . . to take it outside the heartland."

Parks asks us to reconsider the district court's refusal to depart downward in light of the extraordinary circumstances of this case and asserts that we must review the departure determination de novo. In response, the government asserts that we lack jurisdiction to review the district court's discretionary refusal to depart downward. Our holding in *United States v. Henderson-Durand*, 985 F.2d 970, 976 (8th Cir.), *cert. denied*, 510 U.S. 856 (1993) is dispositive. In *Henderson-Durand* we held that the discretionary refusal to depart downward is not reviewable under 18 U.S.C. § 3353. We review a denial of a downward departure only to determine whether the district court properly applied the Sentencing Guidelines; we do not review its determination that a departure was not warranted. *Henderson-Durand*, *supra*.

It is clear from a reading of the district court's statement denying Parks's downward-departure motion that the court recognized its authority to depart, and simply chose not to. Thus, the valid sentence imposed by the district court is not subject to our review.

IV. *Demonstrative Aids*

Finally,[4] Parks argues that the introduction of handguns similar to the ones that he obtained–though not the actual ones–prejudiced him at trial. Consequently, he argues, the district court abused its discretion in admitting the demonstrative evidence. During the course of the trial, the government offered numerous firearms into evidence for demonstrative purposes. The government sought to show the jury the types of weapons that Parks allegedly purchased through Tindall. The government argued that these replica weapons would assist the jury in its evaluation of the pending gun charges. The district court permitted the use of the demonstrative aids but gave a limiting instruction to the jury. The district court told the jury that these weapons were admitted for demonstrative purposes only "so you get a sense of what the guns looked like, what type of gun it was." The guns did not go to the jury room during deliberations. The district court further instructed the jury that the handguns were not the actual guns that were purchased.

We review the district court's determinations concerning admissibility of evidence for abuse of discretion. *United States v. Kehoe*, 310 F.3d 579, 590 (8th Cir. 2002). In balancing the prejudicial effect and probative value, great deference is given to the district judge's determination. *United States v. Allee*, 299 F.3d 996, 1002 (8th Cir. 2002). We have previously approved the use of replica evidence, more specifically guns, for demonstrative purposes. *See United States v. McIntosh,* 23 F.3d 1454, 1456 (8th Cir. 1994); *see also*, *Flores v. State of Minnesota*, 906 F.2d 1300, 1304 (8th Cir.), *cert. denied*, 498 U.S. 945 (1990). Courts in our sister circuits have also frequently approved of the admission of replica evidence, more specifically guns,

---

[4] Parks makes a passing argument that the district court erred in admitting Parks's statement to Special Agent Leadingham. However, the statement was made by a party opponent and offered against the party. The statement is admissible under Rule 801(d)(2)(A) of the Federal Rules of Evidence. Accordingly, the district court did not abuse its discretion in admitting Parks's statement.

for demonstrative purposes. *United States v. Aldaco*, 201 F.3d 979, 986 (7th Cir. 2000); *United States v. Russell,* 971 F.2d 1098, 1105 (4th Cir. 1992); *United States v. Ferreira,* 821 F.2d 1, 6 (1st Cir. 1987); *Banning v. United States,* 130 F.2d 330, 335–36 (6th Cir. 1942).

Here, the potential prejudice–jury confusion over whether the guns displayed in court were the actual guns at issue–was adequately addressed by the district court's prohibition on the use of the weapons during deliberations and the accompanying cautionary instructions. Because the use of replica evidence for demonstrative purposes is a widely-accepted practice, and because the court took steps to minimize potential prejudice to Parks, we find no abuse of discretion in allowing the use of replica handguns in this case.

For the foregoing reasons, we affirm the decision of the district court in all respects.

—————————————————