**UNITED STATES of America,
Plaintiff,**

v.

**Dustin Lee HONKEN, Defendant.**

No. CR 01–3047–MWB.

United States District Court,
N.D. Iowa,
Central Division.

June 7, 2004.

Alfredo G. Parrish, Parrish Kruidenier Moss Dunn Montgomery Boles & Gribble, LLP, Des Moines, IA, for Defendant.

Charles J. Williams, U.S. Attorney's Office, Cedar Rapids, IA, for Plaintiff.

**MEMORANDUM OPINION AND ORDER REGARDING GOVERNMENT'S PRE–TRIAL MOTIONS**

BENNETT, Chief District Judge.

TABLE OF CONTENTS

I. INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .933
 A. Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .933
 1. The 1993 case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .933
 2. The 1996 case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .933
 B. Procedural Background To The Present Case . . . . . . . . . . . . . . . . . . .934
 1. Indictments in the present case . . . . . . . . . . . . . . . . . . . . . . . . .934
 2. Pre-trial motions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .937

II. LEGAL ANALYSIS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .938
 A. Defendant's Admissions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .938
 1. Arguments of the parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .938
 2. Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .940
 a. Res gestae . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .940
 b. Admission of party opponent . . . . . . . . . . . . . . . . . . . . . . . .942
 c. Judicial estoppel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .943
 d. Relevance, prejudice, cumulativeness, and "other crimes" . . . . . . . . .945
 e. Overbreadth . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .946
 3. Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .946
 B. Admissibility Of Maps . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .946
 1. Additional factual background . . . . . . . . . . . . . . . . . . . . . . . . . .947
 2. Arguments of the parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .947
 a. Initial arguments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .947
 b. Supplemental arguments . . . . . . . . . . . . . . . . . . . . . . . . . . .949
 3. Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .950
 a. Procedural default . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .950
 b. Crawford v. Washington . . . . . . . . . . . . . . . . . . . . . . . . . . . .951
 i. Facts and issue . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .951
 ii. The meaning of the Confrontation Clause . . . . . . . . . . . . . . .951
 iii. Failings of Roberts v. Ohio . . . . . . . . . . . . . . . . . . . . . . .951
 iv. Replacing Roberts with a bright-line rule . . . . . . . . . . . . . .953
 c. The effect of Crawford . . . . . . . . . . . . . . . . . . . . . . . . . . . . .954
 i. The meaning of "testimonial." . . . . . . . . . . . . . . . . . . . . .954
 ii. Are the maps "testimonial"? . . . . . . . . . . . . . . . . . . . . . .956
 d. The applicable analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . .957
 i. Co-conspirator statements . . . . . . . . . . . . . . . . . . . . . . .958
 ii. Statements against penal interest . . . . . . . . . . . . . . . . . .961
 C. Admissibility Of Audio Recordings . . . . . . . . . . . . . . . . . . . . . . . . . .963
 D. Admissibility Of Replica Firearm . . . . . . . . . . . . . . . . . . . . . . . . . . .964
 1. The motion and the defendant's procedural default . . . . . . . . . . . . . .964
 2. Additional factual background . . . . . . . . . . . . . . . . . . . . . . . . . .965
 3. Arguments of the parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .965
 4. Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .965
 a. Applicable law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .965
 b. Application of the law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .968

III. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .969

In this death penalty case, involving the alleged murder of five witnesses to the defendant's drug-trafficking or other alleged criminal conduct,[1] the government has filed a series of pre-trial motions on

1. The charges on which the government has given notice of intent to seek the death penalty are murder while engaging in a drug-trafficking conspiracy ("conspiracy murder"), in violation of 21 U.S.C. § 848(e)(1)(A) and 18 U.S.C. § 2, and murder while engaging in or working in furtherance of a continuing criminal enterprise ("CCE murder"), also in violation of 21 U.S.C. § 848(e)(1)(A) and 18 U.S.C. § 2.

the admissibility of various kinds of evidence. The evidence in question consists of the defendant's admissions during his guilty plea, sentencing, and conviction of drug charges in 1997–98; certain maps made by an alleged co-conspirator showing where the alleged murder victims were buried; certain audio recordings of meetings between the defendant and two cooperating witnesses; and a replica firearm of the type allegedly used and carried by the defendant. The defendant resists admission of at least some of this evidence.

## I. INTRODUCTION

### A. Background

#### 1. The 1993 case

The background to the government's pre-trial motions in this case begins with a survey of the prior prosecutions of defendant Dustin Lee Honken in this judicial district. Honken was first prosecuted for drug-trafficking offenses in this district in 1993 in Case No. CR 93–3019 ("the 1993 case"). As the Eighth Circuit Court of Appeals explained,

> In April 1993, a grand jury in the Northern District of Iowa indicted appellee for conspiracy to distribute methamphetamine. After the disappearance of one or more prospective prosecution witnesses, the government dismissed the indictment.

United States v. Honken, 184 F.3d 961, 963 (8th Cir.), cert. denied, 528 U.S. 1056, 120 S.Ct. 602, 145 L.Ed.2d 500 (1999). Thus, the first prosecution of Honken in this district did not lead to a conviction.

#### 2. The 1996 case

Honken was again indicted on drug-trafficking charges on April 11, 1996, this time with co-defendant Timothy Cutkomp, in Case No. CR 96–3004–MWB ("the 1996 case"). Count 1 of the Indictment in the 1996 case charged Honken and Cutkomp with conspiracy, between about 1993 and February 7, 1996, to distribute, manufacture, and attempt to manufacture 1000 grams or more of a mixture or substance containing a detectable amount of methamphetamine and 100 grams or more of pure methamphetamine. Indictment in Case No. CR 96–3004–MWB (N.D.Iowa). Count 2 of the original Indictment in the 1996 case charged Honken with possessing and aiding and abetting the possession of listed chemicals, in violation of 21 U.S.C. § 841(d) and 18 U.S.C. § 2, and Count 3 charged possession and aiding and abetting the possession of drug paraphernalia intending to use such paraphernalia to manufacture and attempt to manufacture methamphetamine and listed chemicals, in violation of 21 U.S.C. § 843(a)(6) and 18 U.S.C. § 2, respectively. Id., Counts 2 & 3. A superseding indictment filed later in the 1996 case restated the first three charges and added a fourth charge of attempting to manufacture methamphetamine. See Superseding Indictment in Case No. CR 96–3004–MWB (N.D.Iowa).

Eventually, in 1997, Honken pleaded guilty to the conspiracy charge and the charge of attempting to manufacture methamphetamine, i.e., Counts 1 and 4, and the government dismissed Counts 2 and 3. See, e.g., Honken, 184 F.3d at 963. The court held an episodic sentencing hearing on December 15 and 16, 1997, and February 17, 18, and 24, 1998. Honken testified under oath on February 18 and 24, 1998. After the government's appeal of the sentence originally imposed by the undersigned, see id., Honken was resentenced on January 25, 2000. Honken then unsuccessfully appealed his sentence, see United States v. Honken, 2 Fed.Appx. 611 (8th Cir.2001). Honken is now serving his sentence on Counts 1 and 4 in the 1996 case.

### B. Procedural Background To The Present Case

#### 1. Indictments in the present case

The present prosecution began with the filing of a seventeen-count indictment against Honken on August 30, 2001, which brought a variety of charges arising from Honken's alleged murder and solicitation of murder of witnesses to his alleged drug-trafficking and other criminal activity, which had, for example, allegedly brought the 1993 prosecution to its abrupt conclusion and had been intended to impede prosecution of the 1996 case. On August 23, 2002, a Superseding Indictment was handed down in this case, amending Counts 8 through 17. *See* Superseding Indictment (docket no. 46). The court will examine the charges in this case in more detail as a prelude to a discussion of the admissibility of certain evidence at trial of those charges.

Counts 1 through 5 of the Superseding Indictment charge "witness tampering." More specifically, each count alleges that Honken "did willfully, deliberately, maliciously, and with premeditation and malice aforethought, unlawfully kill" one of five witnesses: Gregory Nicholson, Lori Duncan (Nicholson's girlfriend), Amber Duncan and Kandi Duncan (Lori Duncan's daughters, ages 6 and 10), and Terry De-Geus. Count 1 alleges that Gregory Nicholson was murdered

1) with the intent to prevent Gregory Nicholson from attending or providing testimony at an official proceeding in the Northern District of Iowa, Case Nos. 93–20 M and CR 93–3019 [the 1993 case]; 2) with intent to prevent Gregory Nicholson from communicating to a law enforcement officer of the United States, information relating to the commission or possible commission of federal offenses, including: the distribution of methamphetamine, the manufacture of methamphetamine and conspiracy to dis-

tribute and manufacture methamphetamine, a Schedule II Controlled Substance, in violation of Title 21 United States Code, Sections 841 and 846; and 3) with intent to retaliate against Gregory Nicholson for providing information to law enforcement relating to the commission or possible commission of federal offenses, including: the distribution of methamphetamine, the manufacture of methamphetamine and conspiracy to distribute and manufacture methamphetamine, a Schedule II Controlled Substance, in violation of Title 21 United States Code, Sections 841 and 846[;] and 4) with intent to retaliate against Gregory Nicholson for testifying before the Federal Grand Jury investigating the drug trafficking activities of DUSTIN LEE HONKEN and others, which killing is a first degree murder as defined by Title 18, United States Code, Section 1111.

This is in violation of Title 18, United States Code, Sections 1512(a)(1)(A) & (C); 1513(a)(1)(A) & (B) and 1111.

Superseding Indictment, Count 1. Counts 2, 3, and 4 allege that Lori Duncan, Kandi Duncan, and Amber Duncan, respectively, were murdered

with the intent to prevent [them] from communicating to a law enforcement officer of the United States, information relating to the commission or possible commission of federal offenses, that is: the tampering with Gregory Nicholson, a federal witness, in violation of Title 18, United States Code, Section 1512; and DUSTIN LEE HONKEN's unlawful contact with Gregory Nicholson, in contempt of court and in violation of DUSTIN LEE HONKEN's conditions of federal pretrial release in Case Nos. 93–20 M and CR 93–3019 [the 1993 case], in violation of Title 18, United States Code, Sections 3148 and 401, which killing of

[each witness] is a first degree murder, as defined by Title 18, United States Code, Section 1111.

This is in violation of Title 18, United States Code, Sections 1512(a)(1)(C), 1512(a)(2)(A), and 1111.

Superseding Indictment, Counts 2–4. Count 5 alleges that Terry DeGeus was murdered

with intent to prevent Terry DeGeus from communicating to a law enforcement officer of the United States, information relating to the commission or possible commission of federal offenses, that is: the distribution of methamphetamine, manufacture of methamphetamine and conspiracy to distribute and manufacture methamphetamine, a Schedule II Controlled Substance, in violation of Title 21 United States Code, Sections 841 and 846, which killing of Terry DeGeus is a first degree murder, as defined by Title 18, United States Code, Section 1111.

This is in violation of Title 18, United States Code, Sections 1512(a)(1)(C), 1512(a)(2)(A), and 1111.

Superseding Indictment, Count 5. The Superseding Indictment includes, in support of Counts 1 through 5, allegations of "Findings under 18 U.S.C. § 3591 and 3592," which the court finds it unnecessary to repeat here, because the government is not seeking the death penalty against Honken on the "witness tampering" charges.

Count 6 charges Honken with soliciting the murder of witnesses, as follows:

Between about June 10, 1996, and February 24, 1998, in the Northern District of Iowa and elsewhere, DUSTIN LEE HONKEN did solicit, command, induce, and endeavor to persuade Dean Donaldson and Anthony Altimus to engage in conduct constituting a felony that has as an element, the use, attempted use, and threatened use of physical force against the person of another in violation of the laws of the United States, that is: 1) the murder of Timothy Cutkomp, with the intent to prevent Timothy Cutkomp's attendance or testimony at a federal drug trial in the Northern District of Iowa, Case No. CR 96–3004 [the 1996 case], in violation of Title 18, United States Code, Sections 1512 and 1111; and 2) the murder of Daniel Cobeen with the intent to prevent Daniel Cobeen from attending or testifying at a federal drug trial in the Northern District of Iowa, Case No. CR 96–3004 [the 1996 case], in violation of Title 18, United States Code, Section 1512 and 1111, with the intent that Dean Donaldson and Anthony Altimus engage in such conduct and under circumstances strongly corroborative of that intent.

This is in violation of Title 18, United States Code, Section 373(a)(1).

Superseding Indictment, Count 6.

Count 7 charges Honken with conspiracy to tamper with witnesses and to solicit the murder of witnesses, as follows:

Between about July 1, 1993, and continuing thereafter, until about 2000, in the Northern District of Iowa and elsewhere, DUSTIN LEE HONKEN did knowingly and willfully combine, conspire, confederate, and agree with other persons known and unknown to the grand jury, to commit the following offenses against the United States:

1. To kill or attempt to kill another person with the intent to prevent the attendance or testimony of that person at an official proceeding, in violation of Title 18, United States Code, Section 1512(a)(1)(A);

2. To kill or attempt to kill another person with the intent to prevent communication by a person to a law enforcement officer of information

relating to the commission or possible commission of a federal offense or violations of conditions of release pending judicial proceedings, in violation of Title 18, United States Code, Section 1512(a)(1)(C);

3. To knowingly use intimidation, physical force, threats, or otherwise corruptly to persuade another person with the intent to influence, delay, or prevent testimony of a person at an official proceeding, in violation of Title 18, United States Code, Section 1512(b)(1);

4. To knowingly use intimidation, physical force, threats, or otherwise corruptly persuade another person with the intent to hinder, delay, or prevent communication to a law enforcement officer of information relating to the commission or possible commission of a federal offense or a violation of conditions of release pending judicial proceedings, in violation of Title 18, United States Code, Section 1512(b)(3); and

5. To solicit, command, induce, and endeavor to persuade a person to commit a felony that has as an element the use, attempted use or threatened use of physical force against the person or property of another, specifically violations of 18 U.S.C. § 1512(a)(1)(A) & (C) (murder and attempted murder of individuals with intent to prevent them from testifying or communicating information to law enforcement officials) and 1512(b)(1) & (3) (knowingly using, or attempting to use, intimidation, force, threats or corrupt persuasion of an individual with intent to prevent them from testifying or communicating information to law enforcement officials) with the intent that such person engage in such conduct and under circumstances strongly corroborative of that intent, in violation of Title 18, United States Code, Section 373.

Superseding Indictment, Count 7. Count 7 includes fourteen numbered paragraphs of allegations of "Background to Overt Acts" and thirty numbered paragraphs of allegations of "Overt Acts" in furtherance of the conspiracy, which the court will not quote here.

Honken is also charged in Counts 8 through 12 of the Superseding Indictment in this case with five counts of murder while engaging in a drug-trafficking conspiracy ("conspiracy murder"), in violation of 21 U.S.C. § 848(e)(1)(A) and 18 U.S.C. § 2. As they presently stand, each of these Counts charges the "conspiracy murder" of one of five people—Gregory Nicholson, Lori Duncan, Amber Duncan, Kandi Duncan, and Terry DeGeus, respectively—as follows:

On or about July 25, 1993 [November 5, 1993, as to DeGeus], in the Northern District of Iowa, DUSTIN LEE HONKEN, while knowingly engaging in an offense punishable under Title 21, United States Code, Sections 846 and 841(b)(1)(A), that is between 1992 and 1998 DUSTIN LEE HONKEN did knowingly and unlawfully conspired [sic] to: 1) manufacture 100 grams or more of pure methamphetamine and 1000 grams or more of a mixture or substance containing a detectable amount of methamphetamine and 2) distribute 100 grams or more of pure methamphetamine and 1000 grams or more of a mixture or substance containing a detectable amount of methamphetamine, intentionally killed and counseled, commanded, induced, procured, and caused and aided and abetted the intentional killing of [the named individual], and such killing resulted.

All in violation of Title 21, United States Code, Section 848(e)(1)(A) and Title 18, United States Code, Section 2. Superseding Indictment, Counts 8 through 12.

Counts 13 through 17 of the Superseding Indictment in this case charge Honken with the murder of the same five individuals, respectively, while engaging in or working in furtherance of a continuing criminal enterprise ("CCE murder"), also in violation of 21 U.S.C. § 848(e)(1)(A) and 18 U.S.C. § 2. Those charges are as follows:

On or about July 25, 1993 [November 5, 1993, as to DeGeus], in the Northern District of Iowa, DUSTIN LEE HONKEN, while engaging in and working in furtherance of a continuing criminal enterprise in violation of Title 21, United States Code, Section 848(c), intentionally killed and counseled, commanded, induced, procured, and caused and aided and abetted the intentional killing of [the named individual], and such killing resulted.

The continuing criminal enterprise DUSTIN LEE HONKEN engaged in and worked in furtherance of was undertaken by DUSTIN LEE HONKEN in concert with five or more other persons including, but not limited to, Timothy Cutkomp, Gregory Nicholson, Terry De-Geus, Angela Jane Johnson, and Jeffery Honken. In the organization, DUSTIN LEE HONKEN occupied a position of organizer, supervisor or other position of management. The criminal enterprise involved the commission of a continuing series of narcotics violations under Title 21, United States Code, Section 801 *et. [sic] seq.* occurring between 1992 and 2000, specifically:

[18 numbered paragraphs omitted].

From this continuing criminal enterprise, DUSTIN HONKEN and others derived substantial income and resources.

All in violation of Title 21, United States Code, Section 848(e)(1)(A) and Title 18, United States Code, Section 2. Superseding Indictment, Counts 13 through 17.

On June 10, 2003, the government filed its Notice Of Intent To Seek The Death Penalty Under 21 U.S.C. § 848 (docket no. 120), thereby giving notice of the government's intent to seek the death penalty on the "conspiracy murder" and "CCE murder" offenses in Counts 8 through 17. On July 21, 2003, this court denied Honken's motion to dismiss Counts 8 through 17 on the basis of "former jeopardy" in light of his prior conviction in the 1996 case. *See United States v. Honken,* 271 F.Supp.2d 1097 (N.D.Iowa 2003). Therefore, all of the charges in the Superseding Indictment are currently set for trial beginning on August 16, 2004.

### 2. Pre-trial motions

In anticipation of evidentiary disputes at trial, the government has filed the following pre-trial motions: (1) its December 29, 2003, Request For Hearing, Pursuant To Rule 104(c) Of The Federal Rules of Evidence, Regarding Defendant's Admissions During His Guilty Plea, Sentencing, And Conviction Of Drug Charges In 1997–98 (docket no. 180); (2) its January 5, 2004, Request For Hearing And Pretrial Ruling Regarding Admissibility Of Maps Made By Co–Conspirator Johnson (docket no. 183), which was renewed on February 17, 2004 (docket no. 212); (3) its February 20, 2004, Request For Hearing And Pretrial Ruling Regarding Admissibility Of Audio Recordings (docket no. 213); and (4) its April 26, 2004, Rule 104(c) Motion For Admission Of A Replica Firearm (docket no. 238). Honken eventually resisted some of the government's pre-trial motions.

By order dated May 19, 2004 (docket no. 252), the court directed the government to file and serve, on or before May 26, 2004, a statement delineating the following: (1) the count or counts of the indictment on which the government asserts that each category of evidence addressed in its pre-trial motions would be admissible; and (2) if any evidence is only admissible as to some counts, but not others, the need for and content of an appropriate limiting instruction, including a suggestion for the manner and frequency with which such limiting instructions shall be given in the course of trial. The defendant was directed to file a response to the government's statement on or before May 28, 2004. The government filed the required statement on May 25, 2004 (docket no. 258). After an extension of time to do so, Honken responded to the government's statement on June 1, 2004 (docket no. 266).

The government requested hearings on three of the motions addressed in this ruling and the court originally set oral arguments on those motions. After re-scheduling, the oral arguments were ultimately set for July 1, 2004. However, after due consideration of the parties' sub-missions and the record in this case, the court finds that oral arguments are not necessary to the court's disposition of the motions. Moreover, the court finds that the July 1, 2004, hearing date is better reserved for other pre-trial motions that have either been filed more recently or that are due to be filed by June 18, 2004.[2] Therefore, the court considers the government's pre-trial motions fully submitted. The court will consider those motions in turn.

## II. LEGAL ANALYSIS

### A. Defendant's Admissions

■ The government's first motion is its December 29, 2003, Request For Hearing, Pursuant To Rule 104(c) Of The Federal Rules of Evidence, Regarding Defendant's Admissions During His Guilty Plea, Sentencing, And Conviction Of Drug Charges In 1997–98 (docket no. 180), which seeks a ruling on the admissibility of evidence of Honken's admissions in the 1996 case. More specifically, the government seeks a ruling on the admissibility of the following evidence: (1) certified copies of the judgment in 1998, which was corrected in 2000; (2) a certified transcript of Honken's admissions made during his guilty plea on June 2, 1997; and (3) a certified transcript of his admissions made during his sentencing hearing on February 18, 1998. Honken filed his resistance to admission of this evidence on January 16, 2004 (docket no. 194), and the government filed a reply on January 26, 2004 (docket no. 198).

### 1. Arguments of the parties

The government cites two grounds for admissibility of this evidence: (1) the evidence is direct proof of the conduct charged in this case; and (2) Honken's prior testimony is not hearsay, because it constitutes admissions by a party opponent. As to the first ground for admissibility, the government contends that the doctrine of *res gestae* provides that evidence of a prior crime can be admitted when the prior crime is so blended or connected with the charged crime that proof of one incidentally involves the other, or evidence of the prior crime explains the circumstances of the charged crime, or that evidence tends logically to prove any

---

**2.** The court does not invite motions to reconsider. However, if a party believes that the court's ruling suffers from some serious omis-sion, oversight, or error of law, the court will address a timely filed motion to reconsider at the oral arguments on July 1, 2004.

element of the charged crime. In this case, the government contends that Honken's prior convictions for conspiracy to distribute methamphetamine and attempting to manufacture methamphetamine constitute substantive evidence of the "continuing series of drug offenses" element of the charged "conspiracy murder" and "CCE murder" offenses; tend to prove the "intent" element of the present offenses, by demonstrating motives for the murders; and demonstrate the relationship between Honken, Angela Johnson, other conspirators, and the murder victims. As to the second ground for admissibility, the government contends that Honken's statements in his change-of-plea hearing and sentencing hearing are not hearsay, because they are admissions of a party opponent under Rule 801(d)(2)(A) of the Federal Rules of Evidence. Such statements are admissible, the government contends, even if, standing alone, they establish one of the elements of the charged crime.

In response, Honken contends that the fact that the evidence in question is not barred by the hearsay rule does not mean that it is necessarily admissible; rather, Honken contends that the evidence is inadmissible under Rule 402 of the Federal Rules of Evidence, because it is irrelevant, and under Rule 403, because it is unduly prejudicial, cumulative, or both. Moreover, Honken contends that if the evidence in question is potentially admissible, the government should be required to pinpoint the specific portions of the transcripts that the government seeks to admit.

More specifically, as to his first ground for exclusion of the evidence, Honken contends that the evidence of his prior conviction for conspiracy is not relevant, because the government previously argued—in a successful effort to defeat Honken's "former jeopardy" motion—that the conspiracy charged in the 1996 case is not "the same" conspiracy that is charged in the

"conspiracy murder" and "CCE murder" charges in the present case. Honken contends that the government's argument that the prior conviction proves elements of the charged crimes, when the government previously asserted that the charges in the 1996 case and the present case are completely distinct, is not only disingenuous, but is barred by the doctrine of judicial estoppel. Judicial estoppel applies here, Honken argues, because the government's arguments about the relationship between the prior crimes and the charged crimes are clearly inconsistent, the court adopted the government's position in its ruling on Honken's "former jeopardy" motion, and allowing the government to maintain its inconsistent position now would allow the government to derive an unfair advantage. Honken also contends that the inconsistency in the government's arguments demonstrates the irrelevance of the prior convictions.

Next Honken argues that the evidence is unduly prejudicial and cumulative. Honken contends that the prejudice derives from the possibility that the jury will convict him on the basis that he is a "bad person," not on the basis of evidence related to the charged crimes. If the prior convictions really are for a distinct offense, Honken contends, then the probative value of the evidence of those prior convictions is minimal, while the potential for prejudice is very high. Even if the evidence is somehow relevant and not prejudicial, Honken argues that the evidence admitted should be limited to minimize both the unfair prejudice and cumulativeness of the evidence. For example, Honken contends that the parties could limit the amount of evidence necessary by stipulating to the prior convictions and allowing only the introduction of the certified copies of the judgments.

Finally, Honken contends that the government's request is too broad, because there are 146 pages of transcript from Honken's testimony at his sentencing hearing on February 18, 1998. Honken contends that the government should be required to identify the precise portions of the transcript that it seeks to admit.

In reply, the government contends that Honken has failed to distinguish between a legal argument about the elements of the offenses and an evidentiary argument about the relevance of the prior criminal conduct. The government asserts that it previously argued, and the court found, that there was considerable overlap in the conduct leading to the prior and present charges, but that the offenses nevertheless were not *legally* "the same." Specifically, the government points out that the court noted that the present conspiracy and CCE are considerably expanded in scope of activity and conspirators, and possibly in locations, as compared to the prior conspiracy, and the charged crimes involve murders, so that, even if the government argued that the crimes were not *legally* "the same," the government never asserted that the crimes were *factually* distinct. Instead, the government argues that the prior conspiracy is part of the continuing course of conduct alleged in the charged crimes. Thus, the government asserts, Honken's admissions about his prior drug-trafficking are plainly relevant to the present crimes. Nor is the evidence of prior convictions unfairly prejudicial or cumulative, the government contends, because the evidence tends to prove elements of the charged crimes and is different in nature and impact from evidence of a stipulation to prior convictions. Finally, the government contends that its request for a determination of admissibility is not overbroad, because the jury should have the full context of Honken's admissions to understand and evaluate the evidence.

In the government's statement identifying the specific counts on which this evidence would be admissible, the government contends that this evidence is directly admissible as to all counts of the indictment, because it explains the underlying reasons for or circumstances of criminal conduct charged in all counts. In the alternative, the government argues that the evidence is admissible on all counts pursuant to Rule 404(b) of the Federal Rules of Evidence, because it shows Honken's motive, opportunity, intent, preparation, plan, or state of mind for each charged offense. Honken, on the other hand, contends that, if the evidence is admissible at all, it is only admissible on counts of the indictment requiring proof of a conspiracy to distribute controlled substances and possibly for impeachment purposes.

### 2. Analysis

#### a. Res gestae

As the Eighth Circuit Court of Appeals has explained, "Under the theory of res gestae, evidence of [a] prior crim[e] can be admitted when the prior crime is 'so blended or connected, with the one[s] on trial as that proof of one incidentally involves the other[s]; or explains the circumstances thereof; or tends logically to prove any element of the crime[s] charged.'" *United States v. Riebold,* 135 F.3d 1226, 1229 (8th Cir.) (*en banc*) (quoting *United States v. Forcelle,* 86 F.3d 838, 841 (8th Cir.1996)), *cert. denied,* 524 U.S. 944, 118 S.Ct. 2356, 141 L.Ed.2d 725 (1998); *accord United States v. Holliman,* 291 F.3d 498, 502 (8th Cir.2002) ("The evidence of other vehicles stolen by the conspiracy was admissible under the doctrine of *res gestae,* as this evidence was sufficiently connected to the charged crimes that it tended logically to prove elements of these crimes.") (citing *Riebold*), *cert. denied,* 537 U.S. 1137, 123

S.Ct. 927, 154 L.Ed.2d 831 (2003); *United States v. Roberts,* 253 F.3d 1131, 1134–35 (8th Cir.2001) (holding that the *res gestae* doctrine is not limited to evidence or prior crimes that prove an element of a charged offense, but also encompasses prior crimes that demonstrate the relationship of the defendants in relation to the charged crime, citing *Riebold* and *Moore, infra* ); *United States v. Jefferson,* 215 F.3d 820, 824 (8th Cir.) (citing *Riebold* for a statement of the doctrine), *cert. denied,* 531 U.S. 911, 121 S.Ct. 261, 148 L.Ed.2d 189 (2000); *Moore v. United States,* 178 F.3d 994, 1000 (8th Cir.) (evidence of a prior crime does not have to establish an element of a charged offense to be admissible under the *res gestae* doctrine, if it explains the context of the charged crime, and thus "tends logically to prove any element of the crime charged"), *cert. denied,* 528 U.S. 943, 120 S.Ct. 356, 145 L.Ed.2d 278 (1999); *Forcelle,* 86 F.3d at 841–42 (recognizing that "evidence of other crimes is admissible for the purpose of providing the context in which the [charged] crime occurred," and is thus *"res gestae "* or "intrinsic" evidence, but holding that the evidence of another crime was not admissible in that case, because it did not "complete the story of the charged crimes" and "provide[d] no additional context for the crimes charged," but was only a discrete example of the defendant's wrongdoing). Evidence that falls within the *res gestae* doctrine is not governed by Rule 404(b) of the Federal Rules of Evidence concerning prior crimes or "bad acts." *Roberts,* 253 F.3d at 1135; *Moore,* 178 F.3d at 1000; *Riebold,* 135 F.3d at 1229.

Here, the evidence of the crimes in the 1996 case, and the accompanying evidence of Honken's testimony at his sentencing, is admissible under each of the prongs of the *res gestae* doctrine as to each of the crimes charged in the present indictment. First, the evidence of Honken's crimes in the 1996 case is "so blended or connected, with the one[s] on trial as that proof of one incidentally involves the other[s]" *Riebold,* 135 F.3d at 1229 (internal quotation marks omitted). Indeed, this court noted the extensive "overlap" between the crimes charged in the 1996 case and the "conspiracy murder" and "CCE murder" crimes charged in Counts 8 through 17 of the present case in its ruling on Honken's motion to dismiss on "former jeopardy" grounds, but the court concluded that the "conspiracy murder" and "CCE murder" offenses involve an expanded time frame, both earlier and later than the conspiracy charged in 1996, more and some different conspirators, and an expanded scope of activity. *Honken,* 271 F.Supp.2d at 1115. Second, the court finds that the prior crimes explain the circumstances of the offenses charged in all of the counts of the present indictment. *Riebold,* 135 F.3d at 1229. As the government contends, the evidence of the 1996 convictions and the evidence of Honken's testimony during his sentencing demonstrate the relationship between Honken, Angela Johnson, other conspirators, and the murder victims. Specifically, Honken's testimony at his sentencing includes numerous admissions concerning his dealings with alleged murder victims Greg Nicholson and Terry De-Geus, former associates and alleged murder targets Daniel Cobeen and Timothy Cutkomp, and the persons Honken allegedly solicited to murder Mr. Cobeen and Mr. Cutkomp, who are identified in the indictment as Dean Donaldson and Anthony Altimus, thus establishing the context of and potential motives for the offenses charged in Counts 1 through 17 of the present indictment. Third, this evidence "tends logically to prove ... element[s] of the crime[s] charged." *Riebold,* 135 F.3d at 1229 (internal quotation marks omitted). Again, the court agrees with the government that the crimes in the 1996 case, and

Honken's testimony about them at his sentencing, tend to prove, at a minimum, the agreement to commit drug-trafficking offenses element of the "conspiracy murder" offenses in Counts 8 through 12, the "continuing series of drug offenses" element of the "CCE murder" offenses charged in Counts 13 through 17, and the "intent" element of the offenses charged in all of the counts, by demonstrating motives for the murders that allegedly actually occurred or were solicited to conceal Honken's drug-trafficking or other criminal activities. Thus, in the absence of any other bar, the evidence of Honken's 1996 convictions and his admissions at sentencing concerning those crimes is admissible under the *res gestae* doctrine as to *all* of the present charges. Indeed, it does not appear that Honken has ever asserted that the *res gestae* doctrine is not applicable, but has focused, instead, on other bars to the admissibility of the evidence, which the court will discuss below.

### b. Admission of party opponent

■ The government's alternative contention for the admissibility of Honken's guilty plea, judgment of conviction, and testimony at his change-of-plea hearing and sentencing is that the evidence constitutes admissions of a party opponent pursuant to Rule 801(d)(2)(A) of the Federal Rules of Evidence. The court agrees.

■ The Eighth Circuit Court of Appeals has reiterated that " '[a] guilty plea is admissible in a subsequent collateral criminal trial as evidence of an admission by a party opponent.' " *United States v. Williams*, 104 F.3d 213, 216 (8th Cir.1997) (quoting *United States v. Holmes*, 794 F.2d 345, 349 (8th Cir.1986)). Thus, the guilty plea itself is certainly admissible. Similarly, a defendant's sworn testimony in a prior change-of-plea or sentencing hearing fits within the definition of an admission under Rule 801(d)(2)(A) of the Federal Rules of Evidence, because it is the

defendant's "own statement." *See* FED. R.EVID. 801(d)(2)(A) ("A statement is not hearsay if—[t]he statement is offered against a party and is (A) the party's own statement, in either an individual or a representative capacity."). Other Circuit Courts of Appeals have recognized that a defendant's prior testimony is admissible in a subsequent criminal prosecution as an admission of a party-opponent. *See, e.g., Bacon v. Lee*, 225 F.3d 470, 484 (4th Cir. 2000) ("As the district court recognized, Bacon's prior testimony [at a first sentencing hearing] would have been admissible at the resentencing hearing in any event as admissions of a party-opponent," so defendant's counsel was not ineffective in reading that prior testimony into the record to "remove the sting"), *cert. denied*, 532 U.S. 950, 121 S.Ct. 1420, 149 L.Ed.2d 360 (2001); *United States v. McClellan*, 868 F.2d 210, 215 (7th Cir.1989) (the defendant's prior testimony and written admissions from an adversary proceeding in bankruptcy were admissible pursuant to Rule 801(d)(2) at a subsequent criminal trial). As explained above, Honken's admissions during his sentencing on the 1996 charges demonstrate the relationship between Honken, Angela Johnson, alleged murder victims Greg Nicholson and Terry DeGeus, former associates and alleged murder targets Daniel Cobeen and Timothy Cutkomp, and the persons Honken allegedly solicited to murder Mr. Cobeen and Mr. Cutkomp, who are identified in the indictment as Dean Donaldson and Anthony Altimus, thus establishing the context of and potential motives for the offenses charged in Counts 1 through 17 of the present indictment. Indeed, Honken does not appear to dispute that his prior testimony in the change-of-plea hearing and sentencing hearing constituted admissions, again relying on other bars to admissibility of the evidence. Thus, in the absence of any other bar, Honken's own

sworn testimony from the change-of-plea hearing and the 1998 sentencing hearing is admissible in the trial of *all* of the present charges as admissions pursuant to Rule 801(d)(2)(A).[3]

### c. *Judicial estoppel*

 Honken asserts that there are nevertheless bars to admission of the evidence of his prior conviction and testimony at his change-of-plea and sentencing hearings. First, he argues that admission of the evidence is barred by the doctrine of judicial estoppel. As the Eighth Circuit Court of Appeals very recently explained, judicial estoppel " 'prohibits a party from taking inconsistent positions in the same or related litigation.' " *United States v. Grap*, 368 F.3d 824, 830–31 (8th Cir.2004) (quoting *Hossaini v. Western Mo. Med. Ctr.*, 140 F.3d 1140, 1142 (8th Cir.1998)). " '[J]udicial estoppel is an equitable doctrine invoked by a court at its discretion.' " *Id.* (quoting *New Hampshire v. Maine*, 532 U.S. 742, 750, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001), with internal quotation marks omitted).

 The Supreme Court has explained the doctrine of judicial estoppel more fully, as follows:

"[W]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him." *Davis v. Wakelee*, 156 U.S. 680, 689, 15 S.Ct. 555, 39 L.Ed. 578

(1895). This rule, known as judicial estoppel, "generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." *Pegram v. Herdrich*, 530 U.S. 211, 227, n. 8, 120 S.Ct. 2143, 147 L.Ed.2d 164 (2000); see 18 Moore's Federal Practice § 134.30, p. 134–62 (3d ed. 2000) ("The doctrine of judicial estoppel prevents a party from asserting a claim in a legal proceeding that is inconsistent with a claim taken by that party in a previous proceeding"); 18 C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 4477, p. 782 (1981) (hereinafter Wright) ("absent any good explanation, a party should not be allowed to gain an advantage by litigation on one theory, and then seek an inconsistent advantage by pursuing an incompatible theory").

*New Hampshire v. Maine*, 532 U.S. at 749, 121 S.Ct. 1808. The factors that "typically inform the decision whether to apply the doctrine in a particular case" are the following: (1) "a party's later position must be 'clearly inconsistent' with its earlier position;" (2) "whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create 'the perception that either the first or the second court was misled"; and (3) "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *Id.* at 750–51, 121 S.Ct. 1808 (citations omitted); *Grap*,

---

**3.** On the other hand, Honken points out that, at his June 2, 1997, change-of-plea hearing, the undersigned stated that the contents of the Rule 11 letter could be considered to establish the factual basis for the plea, but that "when it comes time for sentencing, we're going to start with a clean slate, and you'll be able to contest ... basically anything

else that you and [counsel] want to contest at the time of sentencing." Government's Exhibit 1 (Plea Transcript) at 14. The court will honor the spirit of that statement by allowing only Honken's admissions in *testimony* in the change-of-plea hearing to be admitted at trial on the current charges, but not the contents of the Rule 11 letter.

368 F.3d at 830–31 ("One of the considerations that typically informs the decision of whether to apply the doctrine in a particular case 'is whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.'") (quoting *New Hampshire v. Maine*, 532 U.S. at 751, 121 S.Ct. 1808).

In *Grap*, however, the Eighth Circuit Court of Appeals expressed substantial doubt that judicial estoppel can be asserted against the government in the context of a criminal prosecution:

> Mr. Grap has not identified any criminal case in which we have enforced an estoppel against the government. It is true that in *United States v. French*, 46 F.3d 710, 714 (8th Cir.1995), we assumed, without deciding, that a criminal defendant could assert estoppel. But the Supreme Court has observed that it is "well settled that the Government may not be estopped on the same terms as any other litigant" because "[w]hen the Government is unable to enforce the law because the conduct of its agents has given rise to an estoppel, the interest of the citizenry as a whole in obedience to the rule of law is undermined." *Heckler v. Community Health Servs. of Crawford Cty., Inc.*, 467 U.S. 51, 60, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984). In fact, "the Supreme Court has repeatedly indicated that an estoppel will rarely work against the government," *Conforti v. United States*, 74 F.3d 838, 841 (8th Cir.1996), *cert. denied*, 519 U.S. 807, 117 S.Ct. 49, 136 L.Ed.2d 14 (1996), and we recently stated that a private party trying to estop the government has "a heavy burden to carry." *Morgan v. C.I.R.*, 345 F.3d 563, 566 (8th Cir.2003).

*Grap*, 368 F.3d at 830–31. Thus, this court has considerable doubt that judicial estoppel would apply in this case, even if the pertinent factors were satisfied.

More importantly, however, the court finds that those factors are *not* satisfied here. First, and fatally, the court finds that the government's prior position that the present charges in Counts 8 through 17 and the conspiracy in the 1996 case for which Honken was convicted are not "the same," for "former jeopardy" purposes, is not "clearly inconsistent" with the government's present position that the prior conspiracy conviction is admissible under the *res gestae* doctrine. *See New Hampshire v. Maine*, 532 U.S. at 750–51, 121 S.Ct. 1808 (first factor). Instead, the court must agree with the government that Honken has mistaken a position that the crimes are not legally "the same," which the government asserted, for a position that the past and present crimes are "factually distinct," which the government has never asserted. The government previously argued that the crimes were not "the same," under *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), because the conspiracy underlying the present charges lasted longer, involved more people, and involved additional conduct, *even if it involved some of the same conduct, objectives, and people, and overlapped the previously charged conspiracy in time. See Honken*, 271 F.Supp.2d at 1104. The government also argued that the past crimes and charged offenses are not "the same" under *Garrett v. United States*, 471 U.S. 773, 105 S.Ct. 2407, 85 L.Ed.2d 764 (1985), because the present offenses are not "the same" under a commonsense view, where the present charges involve murders, and the former ones do not. *See Honken*, 271 F.Supp.2d at 1115.[4] In other

---

**4.** The government also argued that the present prosecution on Counts 8 through 17 was not barred by the Double Jeopardy Clause, because Congress had expressly authorized cumulative punishment under the "conspiracy murder" and "CCE murder" statute, 21 U.S.C. § 848(e)(1), and because the Double

words, the government expressly acknowledged the factual overlap in its prior arguments, so that its present assertion that the prior crimes are factually "blended" with and probative of elements of the charged crimes is not "inconsistent."

Moreover, even though the court accepted the government's argument that the prior crimes and the charged crimes are not "the same," there is no reasonable perception that the court was misled either the first time or the second time. *See New Hampshire v. Maine,* 532 U.S. at 750–51, 121 S.Ct. 1808 (second factor). Nor is there any "unfair advantage" for the government or "unfair detriment" for Honken where there is no inconsistency in the government's position. *Id.* (third factor); *Grap,* 368 F.3d at 830–31.

Thus, judicial estoppel stands as no bar in this case to the admissibility of the evidence of Honken's conviction of prior crimes and transcripts of his testimony in his change-of-plea and sentencing hearings, even if, as a general proposition, judicial estoppel can be asserted against the government by a criminal defendant.

### d. Relevance, prejudice, cumulativeness, and "other crimes"

■ Honken next argues that, even if otherwise admissible, the evidence should be barred as irrelevant under Rule 402 of the Federal Rules of Evidence and unfairly prejudicial and cumulative under Rule 403. Honken is correct that irrelevant evidence is inadmissible pursuant to Rule 402, *see* FED.R.EVID. 402 (irrelevant evidence is not admissible), and that, even if the evidence might otherwise be admissible, for example, under the *res gestae* doctrine, "[s]uch evidence is still subject to

the requirement of Fed.R.Evid. 403 that its probative value is not substantially outweighed by the danger of unfair prejudice." *Moore,* 178 F.3d at 1000. Nevertheless, Honken's Rule 402 and 403 arguments ultimately are not persuasive.

■ First, as explained above, in relation to the question of admissibility under the *res gestae* doctrine, the evidence in question is relevant, and thus, not barred by Rule 402, as to any of the present counts. Second, for Rule 403 purposes, the probative value, for all counts, of evidence beyond the mere fact of Honken's prior conviction outweighs the prejudice, if any, of that evidence, because the evidence explains the context and circumstances of the charged crimes, such as the relationship of the persons involved, the scope of their criminal activities, and the manner in which they carried out those criminal activities. *See Roberts,* 253 F.3d at 1135 (rejecting one defendant's assertion that evidence of his prior bank robberies was unfairly prejudicial, because the probative value outweighed any prejudice, where the evidence helped to explain the circumstances of the charged bank robbery and the nature of the defendants' relationship with regard to the charged crime). Third, the government is not required to settle for a stipulation regarding Honken's prior conviction, because the Eighth Circuit Court of Appeals has rejected the notion that the government is required to agree to a defendant's offer to stipulate to the fact of an earlier conviction rather than admitting to the nature of the conviction, where, as here, " 'the purpose of the evidence [is not] solely to prove the element of prior conviction,' " for example, on a

---

Jeopardy Clause does not provide greater protection against *successive prosecutions* than it does against *successive punishments,* so that the Double Jeopardy Clause does not bar a later prosecution where the government has

*won* the earlier one. *See Honken,* 271 F.Supp.2d at 1104. These arguments do not appear to be inconsistent in any way with the government's present arguments, and Honken does not argue that they are.

charge of felon in possession of a firearm, but to prove the context of the charged crime or to tend logically to prove the elements of the charged crime. *See Jefferson,* 215 F.3d at 824 (quoting *Old Chief v. United States,* 519 U.S. 172, 174, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997)). The court also agrees with the government that there is an especial potency and probative value to Honken's own testimony regarding his prior conduct that weighs in favor of admissibility of this evidence. The court finds no bar to admission of the evidence in question under Rule 402 or Rule 403 of the Federal Rules of Evidence as to all counts in the present indictment.

■■■ The government asserts, in the alternative, that the 1996 convictions are admissible on *all* of the present charges as "other crimes" evidence pursuant to Rule 404(b). Even though the crimes in the 1996 case allegedly occurred *after* the murders charged in Counts 1 through 5 and 8 through 17, "Rule 404(b) applies to evidence of subsequent as well as prior crimes, wrongs, or acts." *United States v. DeAngelo,* 13 F.3d 1228, 1231 (8th Cir.) (citing *United States v. Johnson,* 934 F.2d 936, 939–40 (8th Cir.1991)), *cert. denied,* 512 U.S. 1224, 114 S.Ct. 2717, 129 L.Ed.2d 842 (1994). Rule 404(b) permits admission of other crimes evidence, for example, to prove "motive," *see* FED.R.EVID. 404(b), and a review of the copious admissions in Honken's sentencing in the 1996 case, such as his admissions regarding his drug dealing and his relationships with the alleged victims and persons allegedly solicited to murder witnesses, demonstrate that those admissions may, as the government contends, show the "underlying reason" for Honken to kill witnesses in 1993.

### e. Overbreadth

■■■ Finally, Honken argues that the government's request to admit all of his prior testimony in the change-of-plea and sentencing hearings is overbroad and, consequently, should be narrowed to pinpoint specifications of the testimony that the government wishes to introduce. The government argues that Honken's full testimony is admissible to present fairly the context of all of his admissions. The court, again, agrees with the government, at least to the extent the court can evaluate cumulativeness or overbreadth of the evidence prior to trial.

### 3. Summary

The court concludes that the following evidence is admissible on *all* of the charges in the present indictment, because it is either *res gestae* evidence or admissions within the meaning of Rule 801(d)(2)(A), or both: (1) certified copies of the judgment in 1998, which was corrected in 2000; (2) a certified transcript of Honken's admissions made during his guilty plea on June 2, 1997; and (3) a certified transcript of his admissions made during his sentencing hearing on February 18, 1998. In the alternative, the evidence is admissible pursuant to Rule 404(b) as "other crimes" evidence demonstrative of Honken's motives for the alleged murders and alleged solicitation of murders. Furthermore, the court concludes that the admissibility of this evidence is not barred by judicial estoppel, Rule 402 or Rule 403, or "overbreadth" of the designation of the evidence. Therefore, the government's motion for admission of this evidence will be granted.

### B. Admissibility Of Maps

The government next requests a ruling on the admissibility of hand-drawn maps, purportedly made by Angela Johnson, Honken's alleged co-conspirator, showing where the bodies of their alleged murder victims were buried. The government initially filed this motion on January 5, 2004 (docket no. 183), then renewed it on Feb-

ruary 17, 2004 (docket no. 212), after Honken failed to respond to the initial motion. Honken resisted the renewed motion on March 3, 2004 (docket nos. 224 & 225), then filed a supplemental brief in opposition to the motion on March 19, 2004 (docket no. 230), citing a newly-decided Supreme Court decision, *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). The government filed a supplemental brief of its own on April 28, 2004 (docket no. 242), regarding the impact, if any, of *Crawford* on the present case. Consideration of this motion begins with a review of some additional factual background.

### 1. Additional factual background

As this court explained in a ruling in the companion case against Angela Johnson, *see United States v. Johnson,* 196 F.Supp.2d 795 (N.D.Iowa 2002), *rev'd,* 338 F.3d 918 (8th Cir.2003), *and rev'd,* 352 F.3d 339 (8th Cir.2003), a jailhouse informant named Robert McNeese succeeded in obtaining a great deal of information from Johnson while both were incarcerated in the Benton County Jail in the summer and early fall of 2000. On September 18, 2000, McNeese disclosed to an officer at the Benton County Jail that he had obtained from Johnson a map of the location of the bodies of the witnesses that Honken is charged with killing, an explanation of how the witnesses had been killed, and an explanation of Johnson's involvement in disposing of the murder victims' bodies. McNeese also claimed to have obtained one or more maps after September 26, 2000, "from the books" in the jail library where he and Johnson left notes for each other. Johnson had purportedly made the maps so that McNeese could pass them on to an inmate serving a life sentence in another prison who might be willing to confess to the murders. The maps were intended to provide information to the other inmate to lend credibility to his perjured confession.

Although McNeese reiterated to law enforcement officers that he had such a map or maps on two other occasions after September 18, 2000, he initially refused to turn over any such items. Eventually, however, officers obtained from McNeese the hand-drawn maps and notations describing the locations of the graves of the five murder victims and the conditions of their bodies. In October and November 2000, using Johnson's maps and notes, the government located and exhumed the remains of Greg Nicholson, Lori Duncan, Kandi Duncan, Amber Duncan, and Terry DeGeus.

In Johnson's case, on a motion to suppress the evidence that McNeese had obtained from Johnson, the government conceded, and this court held, that McNeese was a government agent at the time that he acquired the maps from Johnson. *See Johnson,* 196 F.Supp.2d at 864–65 (holding that McNeese was a government agent after September 11, 2000). That ruling was not disturbed on appeal, although the Eighth Circuit Court of Appeals overturned this court's ruling that McNeese had obtained the maps and other evidence in violation of Johnson's Sixth Amendment right to counsel. *See United States v. Johnson,* 338 F.3d 918 (8th Cir.2003); *United States v. Johnson,* 352 F.3d 339 (8th Cir.2003).

### 2. Arguments of the parties
#### a. Initial arguments

In support of its original motion regarding admissibility of the maps, the government argues that the maps are non-hearsay co-conspirator statements, or in the alternative, statements falling within a hearsay exception for statements against penal interest. In addition, the government argues that admission of the maps

would not violate Honken's Sixth Amendment right of confrontation.

More specifically, the government argues that the maps are statements of a co-conspirator made in the course and in furtherance of the conspiracy, and thus are not hearsay pursuant to Rule 801(d)(2)(E) of the Federal Rules of Evidence. The government contends that it can establish that the conspiracy existed, that both Honken and Johnson were members of that conspiracy, and that Johnson made the maps in the course and in furtherance of the conspiracy. Indeed, the government contends that the maps themselves are evidence of the conspiracy. The government also contends that the agreement of the conspirators to act, and to continue to act, to cover up their murders to obstruct justice was part of, and in furtherance of, the original conspiracy to commit the 1993 murders and to conceal the bodies in order to avoid prosecution for the conspirators' drug-trafficking activities. Thus, the government contends, the conspiracy continued to exist as long as Honken and Johnson were acting to prevent discovery of their commission of the murders. The government argues that the maps themselves were intended to further this continuing conspiracy, because they were intended to help cover up Honken's and Johnson's involvement in the murders by assisting another person to make a false, but convincing confession to the murders. Thus, the government contends, the arrest of Honken and Johnson did not end the conspiracy.

In the alternative, the government argues that the maps are statements against Johnson's penal interest, so that they are admissible pursuant to Rule 804(b)(3) of the Federal Rules of Evidence as an exception to the hearsay rule. The government contends that Johnson is "unavailable," owing to her Fifth Amendment right against self-incrimination. The government also contends that the maps and notes are statements against penal interest, because they so clearly and directly implicate Johnson in the murders that no reasonable person would have made them had they not been true. Also, the government points out that Johnson's attempted suicide after she learned that the maps had led to the discovery of the bodies of the murdered witnesses is an indication that she knew the maps incriminated her, as is her comment to her cell mate at the time that she gave the maps to McNeese that she had either set herself free or sent herself to prison for life. The government also contends that the maps and notes are trustworthy, because the statements were not merely self-serving statements to curry favor with law enforcement officers by implicating a third person, but a further attempt by Johnson to avoid the consequences of her own criminal conduct.

Finally, in support of its original motion, the government argues that admission of the maps would not violate Honken's Sixth Amendment right to confrontation, because there are sufficient indicia of the reliability of the evidence, as previously argued, and Johnson is unavailable. In the alternative, the government argues that reliability can be inferred when the statements fall within a firmly-rooted hearsay exception, which they do in this case, as statements of a co-conspirator.

When Honken did not file a timely response to the government's original motion to determine admissibility of the maps, the government filed a renewed motion regarding their admissibility. In that motion, the government contends that its motion should be granted pursuant to the local rules of this court, which provide that a motion to which no timely response is filed may be granted without prior notice by the court.

Only after the government filed its renewed motion did Honken respond, and even then, Honken offers no explanation for his failure to respond to the original motion. Instead, Honken points out, first, that the government did not address the authentication and foundation requirements for admission of the maps. Honken reserves the right to raise objections based on lack of foundation and authenticity at trial, if necessary. In a more direct response to the government's motion, Honken argues that determination of the admissibility of the maps under Rules 801 and 804 may be premature, as it may not be possible to make the necessary determinations outside of the context of trial. evidence.

Honken also argues that it is less than clear that the maps are admissible pursuant to Rule 801, because it is unclear whether a "subsidiary agreement" to conceal evidence and avoid detection actually was formed during the principal conspiracy and merged into the overall conspiracy in this case. In other words, Honken argues that the government has failed to demonstrate that, if Honken and Johnson were co-conspirators, their original conspiracy included a plan to exert strenuous efforts to prevent discovery or that Johnson's maps were not just a "spontaneous reaction" to fear of prosecution. Honken also contends that it is not immediately apparent that the maps were statements in furtherance of a conspiracy, because the making of the maps occurred after the objectives of the conspiracy—to engage in drug trafficking or to eliminate, influence, or obstruct witnesses—had either been achieved or thwarted by the apprehension and arrest of Honken and Johnson.

As to whether or not the maps are admissible pursuant to Rule 804(b)(3), as statements against penal interest, Honken contends that there has as yet been no ruling that Johnson is "unavailable," nor

has there been a ruling on the existence of the Fifth Amendment privilege on which her "unavailability" depends. Honken also argues that there is no corroboration of whether the maps inculpate or exculpate Honken. Honken also contends that there are Confrontation Clause issues where, as here, the purported statements inculpate both Honken and Johnson, and the reliability of the evidence is uncertain. In this regard, Honken contends that he is handicapped by not knowing what foundational testimony, other means of authentication, or evidence of trustworthiness will be used by the government to support the admissibility of this evidence at trial.

### b. Supplemental arguments

After the Supreme Court handed down its decision in *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), on March 8, 2004, Honken filed a supplemental brief addressing the impact of that decision on the Confrontation Clause issue relating to the admissibility of Johnson's maps. Honken asserts that the Supreme Court held in *Crawford* that an out-of-court testimonial statement admitted into evidence under the hearsay exception for statements against penal interest violated the Confrontation Clause, because the only indicia of the reliability of such statements that would satisfy constitutional standards is confrontation. In the process, the Court rejected as unpredictable and inconsistent the rule of *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), that an unavailable witness's statement against a criminal defendant is admissible if it possesses adequate "indicia of reliability" by falling within a firmly-rooted hearsay exception or bearing particularized guarantees of trustworthiness. The newly-defined restrictions of *Crawford*, Honken contends, compel a conclusion that admission of the maps would violate his Sixth Amendment

right to confrontation. Honken contends that *Crawford* rejects admissibility of testimonial statements, for Confrontation Clause purposes, based on some general notion of reliability. Honken contends that McNeese's solicitation of the maps from Johnson, while he was acting as a government agent, placed the maps in the area of concern for "testimonial" hearsay identified in *Crawford*. Thus, he contends that he must be given the opportunity for confrontation to test McNeese's machinations and Johnson's response to them.

In its own supplemental brief, the government characterizes *Crawford* as holding that, where the government offers at trial hearsay evidence that is testimonial in nature, the Confrontation Clause requires actual confrontation, *i.e.*, cross-examination, regardless of how reliable the statement may be. The government acknowledges that the Supreme Court in *Crawford* repudiated the general framework set forth in *Roberts* for analyzing the admissibility of "testimonial" hearsay. On the other hand, the government contends that the *Roberts* framework remains applicable to the admissibility of "non-testimonial" hearsay under the Confrontation Clause. The government thus focuses on what constitutes "testimonial" or "non-testimonial" hearsay. The government contends that the Court identified co-conspirator statements and statements made unwittingly to a government informant as examples of statements that would not be "testimonial" hearsay. Thus, the government argues that the maps are still admissible, because the maps are co-conspirator statements and, therefore, are not hearsay, so that *Crawford* does not apply, or because, to the extent that they are hearsay, they are "non-testimonial," and as such, fall under the *Roberts* analysis, not *Crawford*.

In the statement required by the court, the government asserts that the evidence of the maps is also admissible as to *all* of the counts in the present indictment. This is so, the government contends, because the evidence of the maps is intertwined with the murders charged in Counts 1 through 5 and 8 through 17. The government also contends that the maps are relevant to the conspiracy charge in Count 7, where the murders of the witnesses are listed as overt acts in furtherance of that conspiracy. Finally, the government contends that the maps are relevant to the solicitation of murder charge in Count 6, because they are part of the pattern of conduct of murdering and attempting to murder witnesses. In the alternative, the government contends that the maps are admissible as to all counts pursuant to Rule 404(b) of the Federal Rules of Evidence. Honken again asserts that, if this evidence is admissible at all, it is not relevant to the solicitation of murder charge in Count 6. However, Honken does not explain why not.

### 3. Analysis

#### a. Procedural default

■■■ In its renewed motion, the government contends that its motion to admit the maps should be granted in light of Honken's failure to file a timely resistance. The government is correct that such a course is permissible under the local rules of the Northern District of Iowa, even in criminal cases. *See* N.D. Ia. L.Cr.R. 47.1(a) (stating the time for a resistance to motion to be filed and stating that N.D. Ia. L.R. 7.1 governs motion procedure in criminal cases, except as otherwise specified); N.D. Ia. L.R. 7.1(f) (an unresisted motion may be granted without further notice from the court). The government is also correct that Honken procedurally defaulted by failing to file a resistance to the original motion within the time allowed by the local rules. Moreover, Honken has offered no explanation for why he failed to file a timely resistance to the initial mo-

tion. While the court cannot condone Honken's procedural default, the issues raised in the government's motion regarding the admissibility of the maps have now been joined. Under the circumstances, the court prefers to rule on the merits of the issues presented.

#### b. Crawford v. Washington

This court's analysis of the merits of the government's motion for a ruling on the admissibility of the maps begins with the Supreme Court's recent decision in *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), which the parties first discussed in their supplemental briefs. This is so, because the court must determine whether *Crawford* or some other standard applies to the Confrontation Clause issue presented by Johnson's maps.

*i. Facts and issue.* In *Crawford*, the petitioner, who had been convicted of assault for stabbing a man who had allegedly raped his wife, asserted that his wife's tape-recorded statement to the police had been admitted at trial in violation of his Sixth Amendment right of confrontation. *See Crawford*, 541 U.S. at 36–43, 124 S.Ct. at 1356–59. The wife's statement had been admitted under the Washington version of Rule 804(b)(3), as a statement against penal interest, because it indicated that the wife had led her husband to the alleged rapist's apartment, thus facilitating the assault, and the wife did not testify because of a state marital privilege. *Id.* at 1357–58. The Court noted that *"[Ohio v.] Roberts*, [448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980),] says that an unavailable witness's out-of-court statement may be admitted so long as it has adequate indicia of reliability—*i.e.*, falls within a 'firmly rooted hearsay exception' or bears 'particularized guarantees of trustworthiness.'" *Id.* at 1359 (quoting *Roberts*, 448 U.S. at 66, 100 S.Ct. 2531). However, the petitioner in *Crawford* argued "that this

test strays from the original meaning of the Confrontation Clause and urge[d] [the Court] to reconsider it." *Id.* The Court undertook an extensive analysis to determine whether *Roberts* adequately protected Confrontation Clause concerns with the admissibility of hearsay.

*ii. The meaning of the Confrontation Clause.* The Supreme Court concluded that the history of the right to confrontation of witnesses supports two inferences about the meaning of the Confrontation Clause of the Sixth Amendment: (1) that "the principal evil at which the Confrontation clause was directed was the civil-law mode of criminal procedure, and particularly its use of *ex parte* examinations as evidence against the accused," *see id.* at 1363; and (2) "that the Framers would not have allowed admissions of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *See id.* at 1365.

*iii. Failings of Roberts v. Ohio.* The Court next observed that,

> [a]lthough the results of our decisions have generally been faithful to the original meaning of the Confrontation Clause, the same cannot be said of our rationales. *Roberts* conditions the admissibility of all hearsay evidence on whether it falls under a "firmly rooted hearsay exception" or bears "particularized guarantees of trustworthiness." 448 U.S., at 66, 100 S.Ct. 2531, 65 L.Ed.2d 597. This test departs from the historical principles identified above in two respects. First, it is too broad: It applies the same mode of analysis whether or not the hearsay consists of *ex parte* testimony. This often results in close constitutional scrutiny in cases that are far removed from the core concerns of the Clause. At the same time,

however, the test is too narrow: It admits statements that *do* consist of *ex parte* testimony upon a mere finding of reliability. This malleable standard often fails to protect against paradigmatic confrontation violations.

*Crawford,* 541 U.S. at 59–60, 124 S.Ct. at 1369 (emphasis in the original).

The Court then considered two proposals, from members of the Court and academics, to revise the Court's doctrines "to reflect more accurately the original understanding of the Clause": "First, that we apply the Confrontation Clause only to testimonial statements, leaving the remainder to regulation by hearsay law—thus eliminating the overbreadth referred to above. Second, that we impose an absolute bar to statements that are testimonial, absent a prior opportunity to cross-examine—thus eliminating the excessive narrowness referred to above." *Id.* at 1369–70. Although the Court noted that its decision in *White v. Illinois,* 502 U.S. 346, 112 S.Ct. 736, 116 L.Ed.2d 848 (1992), had rejected the first proposal, the Court did not reconsider *White,* because the wife's statement at issue in the case then before the Court "is testimonial under any definition," making it necessary to consider only the second proposal. *Id.* at 1370.

As to the second proposal, the Court first determined that *Roberts* failed to satisfy Confrontation Clause concerns:

> Where testimonial statements are involved, we do not think the Framers meant to leave the Sixth Amendment's protection to the vagaries of the rules of evidence, much less to amorphous notions of "reliability." Certainly none of the authorities discussed above acknowledges any general reliability exception to the common-law rule. Admitting statements deemed reliable by a judge is fundamentally at odds with the right of confrontation. To be sure, the Clause's ultimate goal is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee. It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination. The Clause thus reflects a judgment, not only about the desirability of reliable evidence (a point on which there could be little dissent), but about how reliability can best be determined. Cf. 3 Blackstone, Commentaries, at 373 ("This open examination of witnesses ... is much more conducive to the clearing up of truth"); M. Hale, History and Analysis of the Common Law of England 258 (1713) (adversarial testing "beats and bolts out the Truth much better").

> The *Roberts* test allows a jury to hear evidence, untested by the adversary process, based on a mere judicial determination of reliability. It thus replaces the constitutionally prescribed method of assessing reliability with a wholly foreign one. In this respect, it is very different from exceptions to the Confrontation Clause that make no claim to be a surrogate means of assessing reliability. For example, the rule of forfeiture by wrongdoing (which we accept) extinguishes confrontation claims on essentially equitable grounds; it does not purport to be an alternative means of determining reliability. *See Reynolds v. United States,* 98 U.S. 145, 158–159, 25 L.Ed. 244 (1879).

> \* \* \*

> *Dispensing with confrontation because testimony is obviously reliable is akin to dispensing with jury trial because a defendant is obviously guilty. This is not what the Sixth Amendment prescribes.*

*Crawford,* 541 U.S. at 60–64, 124 S.Ct. at 1370–71 (emphasis added).

The Court reasoned, further, that "[t]he legacy of *Roberts*" demonstrated that "[t]he framework is so unpredictable that it fails to provide meaningful protection from even core confrontation violations," but that "[t]he unpardonable vice of the *Roberts* test . . . is not its unpredictability, but its demonstrated capacity to admit core testimonial statements that the Confrontation Clause plainly meant to exclude." *Id.* at 1371. Moreover, "[t]o add insult to injury, some of the courts that admit untested testimonial statements find reliability in the very factors that *make* the statements testimonial," such as the fact that the statement was made against penal interest when made to police while in custody, or the fact that it was given under oath in judicial proceedings. *Id.* at 1372 (emphasis in the original). In other words,

That inculpating statements are given in a testimonial setting is not an antidote to the confrontation problem, but rather the trigger that makes the Clause's demands most urgent. It is not enough to point out that most of the usual safeguards of the adversary process attend the statement, when the single safeguard missing is the one the Confrontation Clause demands.

*Crawford,* 541 U.S. at 65, 124 S.Ct. at 1372.

Indeed, the Court found that *"Roberts'* failings were on full display in the proceedings below," because the wife's statement while in police custody, as a potential suspect, subject to leading questions from police detectives, implicated her husband and at least arguably undermined his self-defense claim, but the trial court nevertheless found that her statement was reliable for several reasons, the state appellate court found that the statement was not reliable for several other reasons, and the state supreme court relied exclusively on the "interlocking character" of the statement with her husband's statement, and "disregarded every other factor the lower courts had considered." *Id.* Thus, the Court concluded, "[t]he case is . . . a self-contained demonstration of *Roberts'* unpredictable and inconsistent application." *Id.* Furthermore, each of the lower courts "also made assumptions that cross-examination might well have undermined." *Id.*

***iv. Replacing Roberts with a bright-line rule.*** The Court recognized that it "could resolve this case by simply reweighing the 'reliability factors' under *Roberts* and finding that [the wife's] statement falls short." *Id.* at 1373. However, the Court declined to follow that course:

But we view this as one of those rare cases in which the result below is so improbable that it reveals a fundamental failure on our part to interpret the Constitution in a way that secures its intended constraint on judicial discretion. Moreover, to reverse the Washington Supreme Court's decision after conducting our own reliability analysis would perpetuate, not avoid, what the Sixth Amendment condemns. The Constitution prescribes a procedure for determining the reliability of testimony in criminal trials, and we, no less than the state courts, lack authority to replace it with one of our own devising.

*Crawford,* 541 U.S. at 67, 124 S.Ct. at 1373. Consequently, instead of simply reweighing "reliability factors," the Court stated the following bright-line rule:

Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law—as does *Roberts,* and as would an approach that exempted such statements from Confrontation Clause scrutiny altogether. *Where testimonial evidence is at issue, however, the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination.*

*Crawford,* 541 U.S. at 68, 124 S.Ct. at 1374 (emphasis added). Because the trial court admitted the wife's testimonial statement against the petitioner, despite the fact that he had not had the opportunity to cross-examine her, the Court held that "[t]hat alone is sufficient to make out a violation of the Sixth Amendment," and reversed and remanded the case. *Id.*

### c. The effect of Crawford

■ The parties appear to agree that the effect of *Crawford* is to make the admissibility of "testimonial" hearsay, under the Confrontation Clause, subject to a bright-line rule that the declarant must be unavailable and the defendant must have had a prior opportunity for cross-examination. The court agrees. As noted above, the Supreme Court stated the rule as follows: "Where testimonial evidence is at issue, ... the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination." *Crawford,* 541 U.S. at 68, 124 S.Ct. at 1374.

However, the disputed question for the application of *Crawford* here is whether or not Johnson's maps are "testimonial." Honken contends that Johnson's maps are "testimonial statements," subject to *Crawford,* because this court found that McNeese was a government agent at the time that he deliberately elicited them from Johnson and that the government intentionally created or knowingly exploited an opportunity for McNeese to circumvent Johnson's right to counsel. Specifically, Honken argues that "McNeese's involvement—even for his own selfish purposes—in the 'production' of Johnson's statements with an 'eye toward trial,' placed the Johnson maps in the very area of concern identified by the Supreme Court." Honken's Supplemental Memorandum In Resistance To Government's Request For Hearing Regarding Admissibility Of Maps Made By Angela Johnson

at 2. The government, on the other hand, contends that the maps are neither "hearsay," because they are statements of a co-conspirator, nor "testimonial." Indeed, the government contends that "the Court stated [in *Crawford*] that certain types of statements would not constitute 'testimonial' hearsay, and thus would not be subject to the requirement of actual confrontation. Examples of such statements are co-conspirator statements and statements made unwittingly to a government informant." Government's Supplemental Memorandum In Support Of Request For Ruling On Admissibility Of Maps Made By Co-conspirator Johnson at 4–5 (citing *Crawford,* 541 U.S. at 55–57, 124 S.Ct. at 1367) & 7 (repeating this contention). Thus, for non-testimonial or non-hearsay evidence, which the government asserts includes the maps at issue here, the government contends that *Roberts* still establishes the standard for admissibility under the Confrontation Clause.

### i. The meaning of "testimonial."

Unfortunately, the Court in *Crawford* left for another day precisely the question that may be key here: a comprehensive definition of "testimonial." *Crawford,* 541 U.S. at 68–70, 124 S.Ct. at 1374 ("We leave for another day any effort to spell out a comprehensive definition of 'testimonial.'") & n. 10 (acknowledging that "our refusal to articulate a comprehensive definition in this case will cause interim uncertainty," but reasoning that such uncertainty could "hardly be any worse than the status quo"). Nevertheless, the Court provided some clues as to what is and what is not a "testimonial" statement.

First, the Court stated in its conclusion, "Whatever else the term ['testimonial'] covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations," because "[t]hese are

the modern practices with closest kinship to the abuses at which the Confrontation Clause was directed." *Id.* at 1374. Thus, it is plain that such statements are "testimonial," and their admissibility over Confrontation Clause objections is therefore controlled by *Crawford.*

Second, there are clues to the meaning of "testimonial" in the Court's analysis of the "focus" of the Confrontation Clause on "use of *ex parte* examinations as evidence against the accused." *Id.* at 1363. The Court explained,

> *This focus also suggests that not all hearsay implicates the Sixth Amendment's core concerns. An off-hand, overheard remark might be unreliable evidence and thus a good candidate for exclusion under hearsay rules, but it bears little resemblance to the civil-law abuses the Confrontation Clause targeted. On the other hand, ex parte examinations might sometimes be admissible under modern hearsay rules, but the Framers certainly would not have condoned them.*

The text of the Confrontation Clause reflects this focus. It applies to "witnesses" against the accused—in other words, those who "bear testimony." 1 N. Webster, An American Dictionary of the English Language (1828). "Testimony," in turn, is typically "[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact." *Ibid. An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not. The constitutional text, like the history underlying the common-law right of confrontation, thus reflects an especially acute concern with a specific type of out-of-court statement.*

*Various formulations of this core class of "testimonial" statements exist:* "*ex parte* in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially," Brief for Petitioner 23; "extrajudicial statements ... contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions," *White v. Illinois,* 502 U.S. 346, 365, 112 S.Ct. 736, 116 L.Ed.2d 848 (1992) (THOMAS, J., joined by SCALIA, J., concurring in part and concurring in judgment); "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial," Brief for National Association of Criminal Defense Lawyers et al. as *Amici Curiae* 3. *These formulations all share a common nucleus and then define the Clause's coverage at various levels of abstraction around it.* Regardless of the precise articulation, some statements qualify under any definition—for example, *ex parte* testimony at a preliminary hearing.

*Statements taken by police officers in the course of interrogations are also testimonial under even a narrow standard.* Police interrogations bear a striking resemblance to examinations by justices of the peace in England. The statements are not sworn testimony, but the absence of oath was not dispositive. . . .

That interrogators are police officers rather than magistrates does not change the picture either. . . . The involvement of government officers in the production of testimonial evidence presents the same risk, whether the officers are police or justices of the peace.

*In short, even if the Sixth Amendment is not solely concerned with testi-*

*monial hearsay, that is its primary object, and interrogations by law enforcement officers fall squarely within that class.*

*Crawford,* 541 U.S. at 51–53, 124 S.Ct. at 1364–65 (emphasis added). Thus, to the extent that the Confrontation Clause was concerned with out-of-court statements, the Court recognized that the nature of "testimonial" hearsay was that it was in the nature of a formal statement against the accused, with the expectation that the statement would be used against the accused at trial, rather than a casual remark to an acquaintance. Statements made by a witness in an interrogation by law enforcement officers clearly fall within this definition.

### ■ ii. Are the maps "testimonial"?

There is support for the government's contention that the Supreme Court recognized in *Crawford* that "statements in furtherance of a conspiracy" are "not testimonial." *See Crawford,* 541 U.S. at 55–57, 124 S.Ct. at 1367 ("But there is scant evidence that exceptions [to the hearsay rule] were invoked to admit *testimonial* statements against the accused in a *criminal* case. Most of the hearsay exceptions covered statements that by their nature were not testimonial—for example, business records or statements in furtherance of a conspiracy. We do not infer from these that the Framers thought exceptions would apply even to prior testimony.") (emphasis in the original); *see also United States v. Reyes,* 362 F.3d 536, 541 n. 4 (8th Cir.2004) ("[Under *Crawford*] co-conspirator statements are nontestimonial. [*Crawford,* 541 U.S. at 55–57, 124 S.Ct. at 1367.] *Crawford* did not provide additional protection for nontestimonial statements, and indeed, questions whether the Confrontation Clause protects nontestimonial statements at all. *Id.* at [1374]."). Thus, if the government can establish that the maps were made in furtherance of a conspiracy in which Honk-

en was also a member, then they are "nontestimonial," and *Crawford* does not apply.

The maps in question here also plainly are not "prior testimony at a preliminary hearing, before a grand jury, or at a former trial," which the Court in *Crawford* identified as archetypical examples of "testimonial" hearsay. *Id.* at 1374. On the other hand, Honken argues that the maps are the result of "police interrogations," another class of statements that the Court held were "testimonial," and therefore, not admissible in the absence of cross-examination. *Id.; see also id.* at 1364 ("Statements taken by police officers in the course of interrogations are also testimonial under even a narrow standard."). Honken contends that the maps were the result of "police interrogations," notwithstanding that the "interrogation" was by an undercover government agent or jailhouse informant. The court does not agree. Indeed, the court concludes that the maps are not subject to *Crawford,* because they are not "testimonial" statements, even if they *are not* co-conspirator statements.

As this court reads *Crawford,* it is not simply the status of the hearer as a police officer or other government agent that makes statements to such government agents "testimonial" statements. Rather, this court reads *Crawford* to examine the expectation and belief *of the declarant* to determine whether or not the statement is "testimonial," not the expectation or belief of the hearer. *See id.* at 1364 (defining "testimonial" in terms of the declarant's expectations or beliefs about the use to be made of statements). Specifically, the maps were not elicited from someone acting as a "witness" against Honken, that is, from someone " 'bear[ing] testimony,' " because the maps were not, in turn, "testimony," in the sense of " '[a] solemn declaration or affirmation made for the purpose of

establishing or proving some fact,'" *see id.* (quoting 1 N. WEBSTER, AN AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828))—at least, the maps were not a declaration by "an *accuser* who makes a formal statement to government officers," in an attempt to establish some fact *against Honken.*" *Id.* (emphasis added). To put it another way, Johnson certainly did not " 'reasonably expect [the maps] to be used prosecutorially'" when she gave them to McNeese, even if she recognized that such use could be made of them, if discovered, *see id.* (quoting Brief of Petitioner in *Crawford*), nor did she "reasonably ... believe that the [maps] would be available for use at a later trial.'" *See id.* (quoting Brief for National Association of Criminal Defense Lawyers as *Amici Curiae* 3). Even if *McNeese* may have had an expectation or belief that the maps would be used at a trial of Johnson (or Honken), that was not the expectation or belief *of the declarant,* Johnson. Indeed, Johnson's maps are more in the nature of "off-hand, overheard remarks" or "casual remarks to an acquaintance" from Johnson's perspective, unaware as she was of McNeese's status as a government agent, than they are in the nature of the sort of statements to police recognized as "testimonial" in *Crawford.* The Court in *Crawford* identified such "off-hand" or "casual" remarks as having little to do with the Confrontation Clause. *See id.*

Thus, *without regard to whether or not they are co-conspirator statements,* the court concludes that Johnson's maps are *not* "testimonial" statements. Therefore, *Crawford* does not apply to the admissibility of the maps.

#### d. The applicable analysis

■ The government contends that, if the statements are not "testimonial," then the applicable analysis of whether or not they are admissible under the Confrontation Clause is the analysis in *Ohio v. Roberts,* 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980). As the Court stated in *Crawford,* "Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law—as does *Roberts,* and as would an approach that exempted such statements from Confrontation Clause scrutiny altogether." *Crawford,* 541 U.S. at 68, 124 S.Ct. at 1374. One reading of this statement is that there is no Confrontation Clause issue at all as to the admissibility of non-testimonial hearsay, leaving only the evidentiary requirements of hearsay law. *See United States v. Reyes,* 362 F.3d 536, 541 n. 4 (8th Cir.2004) ("*Crawford* did not provide additional protection for nontestimonial statements, and indeed, questions whether the Confrontation Clause protects nontestimonial statements at all. *Id.* at [1374]."). On the other hand, *Crawford* can also be read to make *Roberts* the appropriate analysis of Confrontation Clause requirements for "non-testimonial" hearsay. In the interest of protecting the defendant's rights, because this court concludes that the maps at issue are "non-testimonial," the court will assess the admissibility of the maps, for evidentiary and Confrontation Clause purposes, in light of "hearsay law" *and* Confrontation Clause requirements, as formulated in *Roberts.*

The "hearsay law" requirements at issue here, in light of the government's arguments for admissibility on evidentiary grounds, are Rule 801(d)(2)(E), pertaining to co-conspirator statements, and Rule 804(b)(3), pertaining to statements against penal interest. As to Confrontation Clause requirements, in *Roberts,* the Supreme Court stated,

> [W]hen a hearsay declarant is not present for cross-examination at trial, the Confrontation Clause normally requires a showing that he is unavailable. Even then, his statement is admissible only if

it bears adequate "indicia of reliability." Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception.

*Roberts,* 448 U.S. at 66, 100 S.Ct. 2531; *see also White v. Illinois,* 502 U.S. 346, 356 & n. 8, 112 S.Ct. 736, 116 L.Ed.2d 848 (1992) (recognizing that firmly rooted exceptions to the hearsay rules of evidence carry sufficient indicia of reliability to satisfy the reliability requirement of the Confrontation Clause); *United States v. Chapman,* 356 F.3d 843, 846 (8th Cir.2004) ("Hearsay statements exhibit adequate indicia of reliability if they ' "fall[ ] within a firmly rooted hearsay exception" or ... contain[ ] "particularized guarantees of trustworthiness" such that adversarial testing would be expected to add little, if anything, to the statements' reliability.' ") (quoting *Lilly v. Virginia,* 527 U.S. 116, 124–25, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999) (plurality opinion), in turn quoting *Roberts,* 448 U.S. at 66, 100 S.Ct. 2531, and also citing *United States v. Papajohn,* 212 F.3d 1112, 1119 (8th Cir.2000)).

### i. Co-conspirator statements.

The Eighth Circuit Court of Appeals recently explained the evidentiary and Confrontation Clause requirements for admissibility of a co-conspirator statement, as follows:

> Fed.R.Evid. 801(d)(2)(E) provides that an out-of-court statement is not hearsay if it is offered against a party and is "a statement by a coconspirator of a party [made] during the course of and in furtherance of the conspiracy." The statement need not be made by one conspirator to another conspirator. *United States v. Frazier,* 280 F.3d 835, 848 (8th Cir.2002). Instead, "[t]he relevant questions are (1) whether the declarant, and the defendant against whom the statements are offered, are members of the conspiracy, and (2) whether the declarant made the statements in the course of

and in furtherance of the conspiracy." *Ibid.* Further, our Circuit has held that in order to satisfy the requirements of the Sixth Amendment's Confrontation Clause for the admission of a coconspirator's out-of-court statement, the offering party must demonstrate that the declarant is unavailable, and that the declarant's statement is reliable enough. *United States v. DeLuna,* 763 F.2d 897, 909–10 (8th Cir.1985).

*United States v. Manfre,* 368 F.3d 832, 837–38 (8th Cir.2004) (citing *United States v. DeLuna,* 763 F.2d 897, 909–10 (8th Cir. 1985), for the Confrontation Clause standard, which in turn cites *Roberts* ); *United States. v. King,* 351 F.3d 859, 865 (8th Cir.2003) ("To admit statements of co-conspirators under Federal Rule of Evidence 801(d)(2)(E), the government must demonstrate by a preponderance of the evidence ' "(1) that a conspiracy existed; (2) that the defendant and the declarant were members of the conspiracy; and (3) that the declaration was made during the course and in furtherance of the conspiracy." ' ") (quoting *United States v. Beckman,* 222 F.3d 512, 522 (8th Cir.2000), in turn quoting *United States v. Bell,* 573 F.2d 1040, 1043 (8th Cir.1978)); *but see United States v. Reyes,* 362 F.3d 536, 541 (8th Cir.2004) ("When a statement satisfies the requirements for a co-conspirator statement under Federal Rule of Evidence 801, both the Rules of Evidence and the Confrontation Clause allow the government to introduce the statement through a witness who heard the statement, *even if the government cannot show that the co-conspirator is unavailable.")* *United States v. Inadi,* 475 U.S. 387, 400, 106 S.Ct. 1121, 89 L.Ed.2d 390 (1986). In short, the Confrontation Clause does not give the defendant the right to cross-examine a person who does not testify at trial and whose statements are introduced under the co-conspirator hearsay exclusion.

*White v. Illinois,* 502 U.S. 346, 356, 112 S.Ct. 736, 116 L.Ed.2d 848 (1992).") (emphasis added).[5] Although "Federal Rule of Evidence 801 characterizes out-of-court statements by co-conspirators as exemptions from, rather than exceptions to the hearsay rule," the Eighth Circuit Court of Appeals has observed that "[w]hether such statements are termed exemptions or exceptions, the same Confrontation Clause principles apply." *Reyes,* 362 F.3d at 540 & n. 5 (citing *United States v. Inadi,* 475 U.S. 387, 399 n. 12, 106 S.Ct. 1121, 89 L.Ed.2d 390 (1986)).

Here, the first element for admissibility under Rule 801(d)(2)(E) need not detain the court long: There is more than enough evidence that a conspiracy existed and that both the declarant, Johnson, and the defendant against whom the statements (*i.e.,* the maps) are offered, Honken, are members of the conspiracy. *Manfre,* 368 F.3d at 837–38 (requiring proof that the declarant and defendant were members of the conspiracy); *King,* 351 F.3d at 865 (explicitly requiring proof that the conspiracy existed and that the declarant and the defendant were both members of the conspiracy). Thus, the critical question is whether the maps were made "in the course of and in furtherance of the conspiracy." *Id.* That factor is more problematical here.

 As to the "in the course of and in furtherance" factor, the Eighth Circuit Court of Appeals explained in *Manfre,*

> In explaining the "in furtherance of the conspiracy" component of the rule, we have held that "[a] statement that simply informs a listener of the declarant's criminal activities is not made in furtherance of the conspiracy; instead, the

statement must 'somehow advance the objective of the conspiracy.'" *United States v. Mitchell,* 31 F.3d 628, 632 (8th Cir.1994). That said, we interpret the phrase "in furtherance of" broadly. *United States v. Gjerde,* 110 F.3d 595, 603 (8th Cir.1997). Thus, "[e]fforts to conceal an ongoing conspiracy ... can further the conspiracy by assuring that the conspirators will not be revealed and the conspiracy brought to an end." *United States v. Phillips,* 219 F.3d 404, 419 (5th Cir.2000). A statement of a conspirator which conceals the conspiracy without revealing any of the conspirators' illegal objectives from one who appears suspicious is in furtherance of the conspiracy and thus would be admissible under Rule 801(d)(2)(E).

*Manfre,* 368 F.3d at 837–38. Thus, a statement is "in furtherance of" the conspiracy, "if the overall effect of the conversation is to facilitate the conspiracy," or "if intended to allow the conspiracy to continue, for example, by misleading law enforcers." *United States v. Gjerde,* 110 F.3d 595, 603 (8th Cir.), *cert. denied,* 522 U.S. 949, 118 S.Ct. 367, 139 L.Ed.2d 285 (1997).

 On the other hand, statements made "during a subsequent period when the conspirators were engaged in nothing more than concealment of the criminal enterprise" are *not* in the course of and in furtherance of the original conspiracy, and as such, would *not* be admissible under Rule 801(d)(2)(E). *Dutton v. Evans,* 400 U.S. 74, 81, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970); *Gjerde,* 110 F.3d at 603 (statements were not "in furtherance of" the conspiracy, where they were made several years after its objective had been attained

---

5. Despite this apparent conflict in recent decisions of the Eighth Circuit Court of Appeals as to whether or not the party offering a co-conspirator's statement must prove that the declarant is unavailable in order to satisfy the

Confrontation Clause, this court will assume, without deciding, that the offering party must satisfy the more protective standard, which requires proof that the declarant is unavailable, as stated in *Roberts.*

and were not made in an effort to conceal an on-going conspiracy). As the Eighth Circuit Court of Appeals has explained,

Statements made during the concealment phase of the conspiracy may also be admissible under Rule 801(d)(2)(E). *Id.* In making this determination, courts must be careful to ensure that the statements occurred during an ongoing conspiracy and were made in furtherance of it. *Id.* A conspiracy is ongoing where "acts of concealment were undertaken to preserve the conspiracy and foil attempts at detection." *Id.* Such a case generally exists where the conspiracy is a continuing arrangement with a series of objectives, and concealment is essential to and in furtherance of the survival of its operation. *Id.* Post-arrest confessions or statements incriminating others by one coconspirator are generally not made in furtherance of a conspiracy. *See [United States v.] Alonzo,* 991 F.2d [1422,] 1425–26 [(8th Cir.1993)] (coconspirator's in-custody identification of cocaine source not admissible against other conspirators under Rule 801(d)(2)(E)).

*United States v. Williams,* 87 F.3d 249, 254 (8th Cir.1996), *cert. denied,* 525 U.S. 850, 119 S.Ct. 124, 142 L.Ed.2d 100 (1998). In *Williams,* the court found that the evidence "demonstrate[d] that the conspiracy was continuing to function actively at the time of [the co-conspirator's] statements, and that the statements were made in furtherance of the conspiracy's objectives to profit from the stolen checks and continue to function without discovery." *Id.*

In this case, the pre-trial evidence of the conspiracy and the relationship of the maps to it is uncertain. In other words, the court is not satisfied based on the pre-trial record that, as a matter of law, the maps were intended to "advance" the conspiracy or to conceal it, *so that it would not be brought to an end, see Manfre,* 368 F.3d at 837–38, or to "facilitate" the con-

spiracy or mislead law enforcement officers *so that the conspiracy could continue, see Gjerde,* 110 F.3d at 603; or to preserve an actively functioning conspiracy and foil attempts at detection, *Williams,* 87 F.3d at 254, rather than simply part of a subsequent phase of concealment. *See Dutton,* 400 U.S. at 81, 91 S.Ct. 210; *Williams,* 87 F.3d at 254. If the objectives of the charged conspiracy are read broadly enough—for example, to include both obstruction of justice and concealment of that obstruction—then there is an argument that the maps were made in the course of and in furtherance of the conspiracy, as the government contends. On the other hand, there is evidence that the maps were purportedly made and revealed only after or at the end of the charged term of the conspiracy, after both Honken and Johnson had been arrested and incarcerated. Moreover, while the maps may have been part of an attempt to conceal Johnson's (and Honken's) wrong-doing—by helping another person make a credible, but false confession to the murders—it is not clear that they were made for any purpose other than concealment of past wrong-doing, not as part of an actively functioning conspiracy, and in furtherance of that conspiracy's objectives. Thus, the court cannot grant the government's motion to admit the maps as to even the evidentiary requirements for admission of the maps as coconspirator statements.

 Nevertheless, the court will also consider the admissibility of the maps under the Confrontation Clause, considering both the "unavailability" of the declarant, Johnson, and the "reliability" of the evidence. *See Roberts,* 448 U.S. at 66, 100 S.Ct. 2531; *Manfre,* 368 F.3d at 837–38; *and compare Reyes,* 362 F.3d at 541 ("unavailability" is not required for co-conspirator statements to be admissible under the Confrontation Clause). As to this analysis,

the court again has little doubt that Johnson is "unavailable." "While the defendant can call the declarant [of a co-conspirator statement] as a witness, he cannot do so when, as here, the declarant's only 'testimony' will be an inadmissible [Fifth Amendment] privilege invocation." *Reyes,* 362 F.3d at 542. The second prong of this inquiry, however, is again problematical.

■ The Eighth Circuit Court of Appeals requires no separate determination of the reliability of co-conspirator statements for purposes of admissibility under the Confrontation Clause:

> Since *Bourjaily v. United States,* 483 U.S. 171, 182–83, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987), this Circuit has rejected the indicia of reliability requirement. *United States v. Beckman,* 222 F.3d 512, 522–23 n. 7 (8th Cir.2000) (holding that *Bourjaily* rejected the proposition that admission of a co-conspirator statement required sufficient indicia of reliability); *United States v. Roach,* 164 F.3d 403, 409 n. 5 (8th Cir. 1998) ("[T]he Supreme Court has explicitly rejected the need for a separate reliability inquiry.").

> Because hearsay rules and the Confrontation Clause are generally designed to protect similar values, and stem from the same roots, ... no independent inquiry into reliability is required when the evidence falls within a firmly rooted hearsay exception. We think that the co-conspirator exception to the hearsay rule is firmly enough rooted in our jurisprudence that ... a court need not independently inquire into the reliability of such statements.

> *Bourjaily,* 483 U.S. at 182–83, 107 S.Ct. 2775, 97 L.Ed.2d 144 (internal quotations and citations omitted).

*King,* 351 F.3d at 865. However, the court determined above that there was an issue for trial on whether the maps qualify as co-conspirator statements, on the basis of a question about whether they were made in the course of and in furtherance of the conspiracy. Therefore, the court cannot conclude that admission of the maps would not violate the Confrontation Clause.

■ *ii. Statements against penal interest.* In the alternative, the government contends that the maps are admissible, on evidentiary and Confrontation Clause grounds, because they are "statements against penal interest" within the meaning of Rule 804(b)(3) of the Federal Rules of Evidence. In *Manfre,* the Eighth Circuit Court of Appeals also addressed the admissibility of a statement against penal interest on both evidentiary and Confrontation Clause grounds:

> Fed.R.Evid. 804(b)(3) establishes an exception to the hearsay rule if the declarant is unavailable to testify at trial, and the declarant made:

> > [a] statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless believing it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

> *See also Gjerde,* 110 F.3d at 603. ["Unavailability" is defined in Rule 804(a).] In addition, the trustworthiness of the statement must be clearly indicated. *Gjerde,* 110 F.3d at 603.

*Manfre,* 368 F.3d at 841; *United States v. Keltner,* 147 F.3d 662, 670 (8th Cir.1998) ("Admission of hearsay statements may be

allowed under Rule 804(b)(3) if the following three elements are met: (1) the declarant must be unavailable to testify at trial, (2) the statement must tend to subject the declarant to criminal liability to such an extent that no reasonable person in his position would have made the statement unless he believed it to be true, and (3) the statement must be supported by corroborating circumstances clearly indicating the trustworthiness of the statement."), *cert. denied sub nom. Nabors v. United States,* 525 U.S. 1032, 119 S.Ct. 574, 142 L.Ed.2d 478 (1998); *Gjerde,* 110 F.3d at 603 (same elements as in *Keltner* ).

■ Again, in this case, there can be little doubt that Johnson is "unavailable." *See id.; see also* FED.R.EVID. 804(b) (the prerequisite for all of the exceptions to the hearsay rule in subsection (b) of the rule is that "the declarant is unavailable as a witness"). Honken has not, at this time, mounted a substantial challenge to Johnson's assertion of a Fifth Amendment privilege against self-incrimination making her "unavailable," asserting instead merely that the court has not ruled upon such a privilege. However, the applicability of Johnson's Fifth Amendment privilege, where she is still awaiting trial on related charges, appears certain in the circumstances thus far presented. As noted above, while a defendant can ordinarily call a declarant as a witness, "he cannot do so when, as here, the declarant's only 'testimony' will be an inadmissible [Fifth Amendment] privilege invocation." *Reyes,* 362 F.3d at 542.

There can also be little doubt that the maps and accompanying annotations, if they were made by Johnson, are patently against her penal interest, because they suggest her knowledge of and involvement in the murders of five people, such that no reasonable person in Johnson's position would have made such statements unless she believed them to be true. FED.

R.EVID. 804(b)(3). While there may be some question as to the extent to which the maps inculpate or exculpate Honken, any inculpation or exculpation of Johnson could only be a matter of degree: Her involvement in the murders or their concealment, required to provide the information in the maps, is inculpatory to some sufficiently serious degree that no reasonable person in her position would have made the statements unless believing them to be true. *See id.* ("A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.") Johnson also purportedly provided the maps to an intimate confidante, not to known law enforcement officers, so there is no "pass the buck" worry impugning the trustworthiness of the statements. *See Manfre,* 368 F.3d at 842. Moreover, there is considerable corroboration of the maps, clearly indicating their trustworthiness, in the fact that the bodies were, indeed, found where the maps indicated that they would be. Thus, the requirements for admissibility of the maps under Rule 804(b)(3) appear to be met in this case. Nevertheless, all evidentiary doubts about the admissibility of the maps are not thereby removed, because the government asserted in only a conclusory manner that it could prove that the maps were made by Johnson, and Honken reserved the right to challenge the maps on foundational and authenticity grounds.

Assuming that the evidence is admissible on evidentiary grounds, the court finds that it would also, necessarily, be admissible over Confrontation Clause objections. As to Confrontation Clause requirements for admissibility of statements against penal interest, the Supreme Court in *Roberts* noted that "reliability" of hearsay statements "can be inferred without more in a case where the evidence falls within a

firmly rooted hearsay exception." *Roberts*, 448 U.S. at 66, 100 S.Ct. 2531. A few years ago, the Eighth Circuit Court of Appeals held that "[s]tatements against penal interest fall within a firmly rooted hearsay exception," so that "the reliability requirements of the Confrontation Clause were satisfied" as to such a statement. *Keltner*, 147 F.3d at 671. On the other hand, more recently, in *Manfre*, the Eighth Circuit Court of Appeals expressly considered the "reliability" of statements against penal interest for Confrontation Clause purposes:

> As our analysis in *United States v. Papajohn*, 212 F.3d 1112, 1118–20 (8th Cir.2000), shows, the context in which the statement is made is of significant import in determining the statement's reliability for Confrontation Clause purposes. This is true, in part, because "it can almost always be said that a statement made by a declarant that incriminates another person in a crime will make it less likely that the declarant will be charged for the crime. The extent to which this fact renders the declarant's statement untrustworthy is a matter of degree." *Id.* at 1119. Thus, the admission of a declarant's grand-jury testimony implicating the defendant satisfies *Lilly [v. Virginia,* 527 U.S. 116, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999),]* and the Confrontation Clause, *id.* at 1120, but a declarant's statements implicating the defendant made while assisting the authorities in completing a controlled drug delivery, did not. *United States v. Chapman*, 345 F.3d 630, 634–635 (8th Cir.2003). There is far less an incentive for someone not the target of a grand jury to lie than there is for a declarant who feels that he is in custody, or something like it, and may become the target of a criminal investigation.

*Manfre*, 368 F.3d at 841–42.

In the first instance, because the maps qualify as statements against penal interest within the meaning of Rule 804(b)(3), a firmly-rooted hearsay exception, *see Keltner*, 147 F.3d at 671, the "reliability" of the maps "can be inferred without more." *Roberts*, 448 U.S. at 66, 100 S.Ct. 2531. To the extent that the court should nevertheless consider the "reliability" of the maps in light of the circumstances, *see Manfre*, 368 F.3d at 841–42, the court does not see circumstances undermining the "reliability" of the maps here. This does not seem to be a case in which the maps incriminate or inculpate Honken in such a way that they make it less likely that Johnson will be charged or convicted of the crime, as well. *Compare id.* Johnson also purportedly provided the maps to an intimate confidante, not to known law enforcement officers, so there is no "pass the buck" worry impugning the trustworthiness of the statements. *See Manfre*, 368 F.3d at 842–43. Moreover, there is considerable corroboration of the maps, proving their reliability, where the bodies were found where the maps indicated that they would be.

Therefore, the government's motion for admission of the maps as Rule 804(b)(3) statements against penal interest, over hearsay and Confrontation Clause objections, will be granted, but admission of the maps may still be subject to challenge on foundational and authenticity grounds. Moreover, the maps are admissible as to *all* of the charged counts, where they clearly are relevant to the murders charged in Counts 1 through 5 and 8 through 17; they are relevant to the murders identified as overt acts for the conspiracy in Count 7; and they are relevant to Count 6 where they are demonstrative of a continuing pattern of obstruction of justice by attempting to murder witnesses.

## C. *Admissibility Of Audio Recordings*

The third motion now before the court is the government's February 20,

2004, Request For Hearing And Pretrial Ruling Regarding Admissibility Of Audio Recordings (docket no. 213). On February 26, 2004, Honken filed a request for extension of time to resist this motion (docket no. 216), which the court granted on February 27, 2004 (docket no. 218), giving Honken to and including March 9, 2004, to file his resistance. No timely resistance was filed on or before March 9, 2004; Honken did not request a further extension of time to file such a resistance; and Honken did not subsequently file a resistance out-of-time with or without leave to do so. On April 26, 2004, the government filed its Response To Court's Order Of February 27, 2004, Granting Defendant An Extension Of Time To File Response To Government's Motion For Pretrial Ruling On Admissibility Of Tape Recordings (docket no. 236), in which the government pointed out the defendant's failure to file any resistance to its original motion by the extended deadline set by the court or at any time thereafter. The government, therefore, requested a ruling in its favor on its original motion pursuant to N.D. IA. L.CR.R. 47.1 and N.D. IA. L.R. 7.1(f).

Where the defendant has never attempted, even belatedly, to respond to the government's motion for admissibility of audio recordings on the merits, despite notice of his procedural default, the court can find no reason to refrain from granting the motion as unresisted pursuant to N.D. IA. L.CR.R. 47.1 and N.D. IA. L.R. 7.1(f). Therefore, the court will grant the government's motion, and the separate audio recordings of meetings between Honken and two men, Greg Nicholson and Timothy Cutkomp, are admissible at trial. The only question remaining is the counts on which the evidence is admissible.

In its statement concerning the counts on which this evidence is admissible, the government contends that the evidence is admissible on the murder counts, Counts 1 through 5 and 8 through 17, because the conversations with Nicholson establish his role as a witness against Honken, and the conversations with Cutkomp include statements by Honken concerning the murders. The government contends, further, that the taped conversations are admissible on the solicitation of murder count, Count 6, and the conspiracy to tamper with or murder witnesses, Count 7, because they show that Nicholson was a witness against Honken in the same way that Cutkomp became a witness against Honken and, consequently, became a target of the solicitation of murder and witness tampering, and they explain Honken's motivation for trying to have Cutkomp killed. Without conceding the admissibility of the recordings, Honken concedes that the recordings, if admissible at all, are admissible as to all counts of the indictment. Therefore, the recordings will be admissible on all counts of the indictment.

### D. Admissibility Of Replica Firearm

#### 1. The motion and the defendant's procedural default

▮ On April 26, 2004, the government filed the final motion now before the court, the government's Rule 104(c) Motion For Admission Of A Replica Firearm (docket no. 238). The motion seeks a ruling on the admissibility, as a demonstrative exhibit, of a replica firearm that is similar in make and model to a firearm that Angela Johnson purchased in 1993 and that witnesses later saw in the possession of Johnson and Honken, but which the evidence will show was subsequently destroyed. Honken filed no timely resistance to this motion, nor did he file any request for extension of time to resist the motion. Instead, on May 28, 2004, he filed a very belated response (docket nos. 260 & 261), without first requesting leave to file a resistance out of time. In that belated response, Honken asserts that the government has

not yet laid sufficient foundation for the use of a replica weapon, even as a demonstrative aid, so that this admissibility issue should be reserved for trial.

Again, the court could reasonably ignore Honken's untimely resistance and grant the government's motion pursuant to N.D. IA. L.CR.R. 47.1 and N.D. IA. L.R. 7.1(f). However, the court concludes that it is preferable, under the circumstances, to consider the motion on its merits.

## 2. Additional factual background

The government asserts that the evidence at trial will show the following facts: that Johnson purchased a Tech 9 semiautomatic firearm at a pawn shop in Waterloo, Iowa, in July 1993; that two other witnesses described a weapon matching the description of a Tech 9 in the possession of Johnson and Honken; that Timothy Cutkomp assisted Honken in using welding equipment to cut up and melt down a firearm matching the description of a Tech 9, then helped Honken dispose of the remains of the weapon by throwing the pieces into ditches; that medical examiners, a forensic expert, and a ballistics expert will testify that the murder victims' remains bear marks consistent with bullet wounds, that some of the bullets and bullet fragments recovered from remains are "not inconsistent with" 9 mm bullets, and that the bullets are consistent with only a limited number of weapons, including a Tech 9.

## 3. Arguments of the parties

In support of this motion, the government states that it intends to introduce, as demonstrative evidence, a Tech 9 firearm similar to the one purchased by Angela Johnson and destroyed by Dustin Honken to assist the jury in its evaluation of the charges against Honken. The government will not offer the replica as the actual weapon purchased by Johnson or identified by witnesses as having been in John-son's or Honken's possession. The government asserts that the replica should be admitted, with proper cautionary instructions, to assist the jury in understanding the evidence in the case.

In his belated response, Honken argues that courts have allowed the admission of replica firearms only after carefully noting that the possession or use of the firearm by the defendant was established through reliable evidence, such as testimony of an investigating officer or other reliable witnesses, by the defendant's own admission, or through physical evidence, which shows an uncontroverted chain of ownership. In addition, Honken argues that courts have required a careful balancing of the relevance of the exhibit against the potential for undue prejudice. He asserts that the proper assessment of the admissibility of the replica firearm in this case cannot be made prior to trial, where the evidence on which the government so far relies is of doubtful reliability or conclusiveness, suggesting minimal relevance, but substantial potential prejudice.

## 4. Analysis

### a. Applicable law

Both the Eighth Circuit Court of Appeals and its sister circuits "have previously approved the use of replica evidence, more specifically guns, for demonstrative purposes." *United States v. Parks*, 364 F.3d 902, 907 (8th Cir.2004) (citing *United States v. McIntosh*, 23 F.3d 1454, 1456 (8th Cir.), *cert. denied*, 513 U.S. 935, 115 S.Ct. 333, 130 L.Ed.2d 291 (1994); and *Flores v. State of Minnesota*, 906 F.2d 1300, 1304 (8th Cir.), *cert. denied*, 498 U.S. 945, 111 S.Ct. 359, 112 L.Ed.2d 322 (1990), as examples from this circuit, and *United States v. Aldaco*, 201 F.3d 979, 986 (7th Cir.2000); *United States v. Russell*, 971 F.2d 1098, 1105 (4th Cir.1992), *cert. denied*, 506 U.S. 1066, 113 S.Ct. 1013, 122 L.Ed.2d 161

(1993); *United States v. Ferreira*, 821 F.2d 1, 6 (1st Cir.1987); and *Banning v. United States*, 130 F.2d 330, 335–36 (6th Cir.1942), as examples from other circuits). Nevertheless, the Eighth Circuit Court of Appeals has considered the admissibility of such evidence, even for demonstrative purposes, by balancing the prejudicial effect and the probative value of such evidence. *Id.*

For example, in *Parks,* the court concluded that evidence of replica firearms was admissible for the following reasons:

> Here, the potential prejudice—jury confusion over whether the guns displayed in court were the actual guns at issue—was adequately addressed by the district court's prohibition on the use of the weapons during deliberations and the accompanying cautionary instructions. Because the use of replica evidence for demonstrative purposes is a widely-accepted practice, and because the court took steps to minimize potential prejudice to Parks, we find no abuse of discretion in allowing the use of replica handguns in this case.

*Parks,* 364 F.3d at 907. Similarly, in *United States v. McIntosh,* 23 F.3d 1454 (8th Cir.), *cert. denied,* 513 U.S. 935, 115 S.Ct. 333, 130 L.Ed.2d 291 (1994), the Eighth Circuit Court of Appeals also assessed the relevance and potential for prejudice in deciding whether the district court properly allowed the government to mark, but not admit, certain replicas as demonstrative exhibits. The government argued that it presented reliable evidence from a police officer and another witness that they had seen the defendant wearing a gun and holster of the type shown to the jury; the demonstrative exhibits were offered to assist the jury in assessing the credibility of those witnesses; and there was no prejudice, because the government ensured that the jury understood that the gun was offered only for the purposes of showing a similar gun, not under a pretense that it was the actual weapon. The court affirmed use of the demonstrative replicas, as follows:

> By observing the size and shape of a .357 revolver, the jury could better assess whether [the police officer] and [other witness] actually could have seen the revolver under [the defendant's] jacket as they testified. *See* Fed. R.Evid. 401, 402. Indeed, the government conceded to the jury that it presented the gun and holster merely for the "purposes of demonstrating items similar to what [the police officer] saw" and that the items did not come from [the defendant].... [W]e cannot say that the district court abused its broad discretion in allowing the government to show the items to the jury.

*McIntosh,* 23 F.3d at 1456–57.

A decision of the Seventh Circuit Court of Appeals, *United States v. Aldaco,* 201 F.3d 979 (7th Cir.2000), which was cited in *Parks,* involves circumstances quite similar to those at issue here. In *Aldaco,* the Seventh Circuit Court of Appeals also applied a probative value/potential prejudice balancing test to determine whether the trial court had properly admitted as demonstrative evidence a replica of a shotgun that had been destroyed. *Aldaco,* 201 F.3d at 986. The court noted that the government introduced the replica to illustrate what a police officer saw when he observed the defendant holding a shotgun in order that the jury might properly determine whether the events happened as the officer testified. *Id.* After noting that courts had approved the use of replica firearms for such purposes, the court affirmed the lower court's admission of the replica shotgun, as follows:

> The only potential prejudice [the defendant] has attempted to identify that might have resulted from allowing the

replica shotgun into evidence is jury confusion over whether the gun displayed in court was actually the shotgun in the defendant's hand on the night of the arrest. To reduce the risk that the replica might in some unknown way prejudice [the defendant], the judge cautioned the government to make clear to the jury that the shotgun it displayed at trial was not the actual shotgun possessed by [the defendant]. The government made this clear both in its opening statement ("the thing to remember as we go through the trial is that [the Mossberg shotgun presented at trial] will not be the same. It will not be the same firearm"), and during its direct examination of [the police officer] by asking him to describe how the firearm at trial differs from that found on July 2, 1993. Finally, the judge assisted in minimizing prejudice by prohibiting the government from keeping the replica shotgun in the court room in plain view of the jury during the trial.

Because the use of replica evidence for demonstrative purposes is a widely-accepted practice, and because the court took steps to minimize potential prejudice to [the defendant], we refuse to hold that the court abused its discretion in allowing the use of a replica shotgun in this case.

*Aldaco,* 201 F.3d at 986–87.

On the other hand, some time ago, the Eighth Circuit Court of Appeals concluded that the "traditional justification" for the admission of a "similar" weapon—in that case, a weapon "found in the possession of a defendant but which could not be positively identified as that used in a crime"— was "cut away" where "there was positive evidence that the pistol admitted was *not* similar to the one used in the crime." *United States v. Wynde,* 579 F.2d 1088, 1094 (8th Cir.) (emphasis in the original), *cert. denied,* 439 U.S. 871, 99 S.Ct. 204, 58 L.Ed.2d 184 (1978). Consequently, the

court held that the evidence "must be seen as irrelevant since it was not probative of the proposition that the accused committed the crime charged." *Id.*

■■■■ Thus, these authorities suggest not only that the admissibility of a replica depends upon a balancing of probative value against prejudice, *see Parks,* 364 F.3d at 907, but that the probative value depends, as Honken suggests, upon whether there is reliable evidence that the defendant possessed and used in the crime a weapon of the same type as the replica. In the absence of such evidence, the "traditional justification" for the use of a replica is "cut away" and the probative value of the replica is non-existent. *Wynde,* 579 F.2d at at 1094. The "prejudice" usually at issue is the potential for the jury to be confused about whether the replica is the weapon actually used in the offense. *See Parks,* 364 F.3d at 907 ("the potential prejudice" was "jury confusion over whether the guns displayed in court were the actual guns at issue"); *McIntosh,* 23 F.3d at 1456 (there was no prejudice, because the government explained that the replicas were not the actual items possessed by the defendant); *accord Aldaco,* 201 F.3d at 986 (the only potential prejudice identified by the defendant was jury confusion over whether the gun displayed in court was actually the shotgun in the defendant's hand at the time of his arrest). However, that prejudice can be ameliorated, for example, where the government makes clear in its use of the replica that it is *not* the actual weapon used or carried by the defendant, the court gives a proper limiting instruction, and the replica is not left on display in the courtroom or given to the jury during deliberations. *Id.* (the replica could not be used during deliberations and the court gave a proper cautionary instruction); *McIntosh,* 23 F.3d at 1456 (the government conceded to the jury that the items did not come from the defendant);

accord *Aldaco,* 201 F.3d at 986 (the government made clear to the jury that the replica was not the actual weapon possessed by the defendant and the court prohibited the government from keeping the replica in the courtroom in plain view of the jury during the trial).

### b. Application of the law

■ As explained above, Honken is correct that there must be some reliable evidence that he possessed a firearm of the same type as the replica. On the other hand, the more specific requirements that Honken would like to see imposed, such as an "uncontroverted chain of possession" for the weapon he allegedly possessed and "definitive scientific evidence proving a connection between the killings alleged in the indictment and a Tech 9 firearm," go to the weight of the evidence, not to its relevance. Indeed, a replica may be used to bolster or refute a witness's testimony that the defendant possessed or used a weapon of the same type as the replica. *See McIntosh,* 23 F.3d at 1456–57 (a replica could be used to help the jury assess the credibility of witnesses' testimony that the witness had a certain kind of weapon in a holster under his jacket); *accord Aldaco,* 201 F.3d at 986–87 (a replica could be used to illustrate what a witness saw and to allow the jury to determine whether events happened as the witness testified that they did). If the evidence at trial of Johnson's and Honken's possession of a firearm matching the description of a Tech 9 is essentially as the government now characterizes it, that evidence will probably be sufficient to establish the probative value of the replica firearm, for example, to assist the jury in determining whether the witnesses actually could have seen a Tech 9 in Honken's or Johnson's possession as those witnesses will purportedly testify. *See id.; Aldaco,* 201 F.3d at 986.

However, final determination on this prong of the inquiry must await trial.

As to the "prejudice" prong of the analysis, Honken's argument is slightly different from the classic argument that the jury will be confused about whether or not the replica is the *actual* weapon used by the defendant. *See Parks,* 364 F.3d at 907; *McIntosh,* 23 F.3d at 1456; *accord Aldaco,* 201 F.3d at 986 (the only potential prejudice identified by the defendant was jury confusion over whether the gun displayed in court was actually the shotgun in the defendant's hand at the time of his arrest). As explained above, there are ways to ameliorate the classic form of prejudice. However, Honken appears to assert that he will be prejudiced unless the evidence establishes beyond dispute that a Tech 9 was actually used in the murders *and* that he actually possessed a Tech 9, not merely that he possessed something that looked like a Tech 9 and that a Tech 9 is one of several possible weapons used to commit the murders. Where his possession of the weapon is too uncertain and the relationship of the weapon to the crimes is too tenuous, his argument seems to run, the evidence is prejudicial, because it might suggest that he is a "bad person" simply on the basis that he may have possessed an evil-looking semi-automatic weapon. The court concludes that the evidence at trial must be sufficient to establish both that Honken possessed a weapon matching the description of a Tech 9 *and* that a Tech 9 could reasonably have been the murder weapon, before use of a replica Tech 9 as a demonstrative exhibit would be appropriate.

In an abundance of caution, therefore, the court will reserve for trial an assessment of whether the government has established the admissibility, for demonstrative purposes, of a replica of a Tech 9 semi-automatic pistol.[6]

---

**6.** The government asserts that a replica Tech 9 is admissible as to all of the murder charges

## III. CONCLUSION

Upon the foregoing, of the four categories of evidence at issue in the government's pre-trial motions, two are admissible without reservation: (1) evidence of admissions in Honken's prior convictions, and (2) recordings of Honken's conversations with Nicholson and Cutkomp. A third category of evidence, maps purportedly made by Honken's co-conspirator, Angela Johnson, showing where the bodies of alleged murder victims were buried, is admissible over hearsay or Confrontation Clause objections, but the admissibility of such evidence may be subject to authenticity and foundational objections. A determination of the admissibility of a fourth category of evidence, a replica firearm to be used for demonstrative purposes, is also reserved for trial.

THEREFORE,

1. The government's December 29, 2003, Request For Hearing, Pursuant To Rule 104(c) Of The Federal Rules of Evidence, Regarding Defendant's Admissions During His Guilty Plea, Sentencing, And Conviction Of Drug Charges In 1997–98 (docket no. 180) is **granted.** The following evidence is admissible at trial on *all* counts: (1) certified copies of the judgment in 1998, which was corrected in 2000; (2) a certified transcript of Honken's admissions made during his guilty plea on June 2, 1997; and (3) a certified transcript of his admissions made during his sentencing hearing on February 18, 1998.

2. The government's January 5, 2004, Request For Hearing And Pretrial Ruling Regarding Admissibility Of Maps Made By Co–Conspirator Johnson (docket no. 183), which was renewed on February 17, 2004 (docket no. 212), is **granted,** to the extent that hand-drawn maps, purportedly made by Angela Johnson, Honken's alleged co-conspirator, showing where the bodies of their alleged murder victims were buried, and notations thereon indicating, *inter alia,* the conditions of the bodies, are admissible over hearsay and Confrontation Clause objections, but the admissibility of this evidence may still be challenged on foundational and authenticity grounds.

3. The government's February 20, 2004, Request For Hearing And Pretrial Ruling Regarding Admissibility Of Audio Recordings (docket no. 213) is **granted** pursuant to N.D. IA. L.CR.R. 47.1 and N.D. IA. L.R. 7.1(f) for lack of a timely resistance.

4. Ruling on the government's April 26, 2004, Rule 104(c) Motion For Admission Of A Replica Firearm (docket no. 238) is **reserved** for final determination at trial.

**IT IS SO ORDERED.**

---

in Counts 1 through 5 and 8 through 17, as well as the charge of conspiracy to tamper with or murder witnesses in Count 7, but concedes that the replica probably is not relevant to the solicitation of murder charges in Count 6, unless it is admissible pursuant to Rule 404(b) to show Honken's state of mind with regard to acquisition of firearms to kill witnesses. The government, therefore, suggests an appropriate limiting instruction identifying the proper Rule 404(b) basis for use of the replica firearm in relation to Count 6. The issue of what, if any, limiting instruction is required with regard to the replica firearm must also be reserved for trial.